JOHN J. KELLEY *v.* WINIFRED BONNEY ET AL.
(14244)

PETERS, C. J., SHEA, CALLAHAN, GLASS and BORDEN, Js.

550

Argued November 7, 1991—decision released April 7, 1992

*Gilbert Shasha,* with whom, on the brief, was *Barry J. Ward,* for the appellant-appellee (plaintiff).

*Thomas G. Moukawsher,* for the appellees-appellants (named defendant et al.).

*John B. Farley,* with whom, on the brief, was *Thomas J. Hagarty, Jr.,* for the appellee (defendant Bruce McDermott).

*Richard A. Roberts,* with whom was *Julie Harris,* for the appellee (defendant board of education of the town of Groton).

CALLAHAN, J. In this appeal, the principal issues involve the propriety of the jury instructions and the scope of the doctrine of absolute privilege in an action by a public school teacher alleging defamation and intentional infliction of emotional distress. The plaintiff, John J. Kelley, formerly a teacher at West Side Junior High School in Groton, initiated this action as a result of statements made about him that allegedly impugned his personal and professional integrity. The plaintiff named as defendants Winifred Bonney, the Groton board of education, Mary Keith, Bruce McDermott, Christian Mitchell, Sherrie Neilson, Wendy Sawyer, Paulann H. Sheets and Lenny Winkler. Keith, McDermott, Sheets and Winkler had been members of the Groton board of education; Mitchell had been a student of the plaintiff; Neilson and Sawyer had been parents of students of the plaintiff; and Bonney had been a neighbor of a student of the plaintiff. The plaintiff alleged that each of the individual defendants had maliciously and negligently published defamatory material and intentionally caused him emotional distress. He further alleged that the Groton board of education had breached a contract with him and had recklessly and negligently caused him emotional distress. After the plaintiff had presented his case, the trial court directed verdicts in favor of McDermott, Mitchell and Sawyer.

At the close of all the evidence, the jury returned verdicts in favor of Keith, Neilson and Winkler. The jury, however, found Bonney and Sheets liable to the plaintiff in the amount of $10,000. The jury also found the Groton board of education liable for breach of contract and for tortious infliction of emotional distress to the plaintiff, and awarded him $3000 against the board. The plaintiff appealed to the Appellate Court, and Sheets and Bonney cross appealed to the Appellate Court. We transferred the appeals to this court in accordance with Practice Book § 4023. We now reverse that part of the judgment of the trial court that imposes liability upon Bonney and Sheets.

The jury could reasonably have found the following facts. In March, 1987, a significant number of the plaintiff's students at West Side Junior High School signed a petition setting forth various allegations of his inappropriate conduct in the classroom. The petition included, inter alia, allegations that the plaintiff verbally abused his students, touched female students against their will and failed to conduct his classes properly. The students' petition was brought to the attention of the Groton board of education, and the Groton superintendent of schools, Joan Stipetic. Stipetic immediately began an investigation into the students' allegations. On April 3, 1987, following her investigation, Stipetic informed the plaintiff that she planned to recommend that the Groton board of education pursue termination proceedings against him. On the advice of his attorney, rather than contesting the termination proceedings, the plaintiff chose to retire from his teaching position. Sometime during the following two weeks, an agreement was reached between the school board and the plaintiff that, among other things, required that the plaintiff retire and that he be paid a lump sum of $2500. Because it was agreed that the plaintiff would retire, Stipetic did not disclose the findings of her investigation or the details of the agreement.

Following the public announcement that the plaintiff would retire, the local newspapers and the public began to demand an explanation for the administration's actions, and also that the allegations made against the plaintiff be more fully investigated. On May 6, 1987, Stipetic and the board's attorney, Richard O'Connor, attended a meeting of the Groton board of education. O'Connor explained to the board members that, because the plaintiff had communicated his intent to retire and, therefore, would no longer be an employee of the Groton board of education, the board would no longer retain jurisdiction over the plaintiff and should not continue to investigate him. Following publication of the fact that no further investigation would be conducted, there was further outcry by some members of the public who sought to have the matter more thoroughly examined. On May 27, 1987, at a meeting of the Groton board of education, Keith moved to place on the agenda the question of whether the matter involving the plaintiff should be referred to the state board of education for investigation. While Keith, McDermott, Sheets and Winkler voted to discuss the possibility of a state investigation, four other board members voted against it, preventing the issue from being placed on the agenda, and effectively defeating the prospect of the Groton board of education referring the matter to the state board. Following the tie vote, Sheets telephoned the state department of education and was told by Mark Stapleton of the office of legal affairs that she, individually, could further pursue this matter by requesting that the state conduct an investigation.

Sheets, Keith, McDermott and Winkler agreed that a request to the state should be made. Accordingly, on May 27, 1987, those four defendants drafted a letter and petition to the state board of education. The May 27, 1987 petition requested that the state board

of education investigate "long standing, numerous parent and student complaints of misconduct concerning [the plaintiff]." The petition stated that the complaints included "allegations of teaching incompetence, and improper overt and covert touching of female students despite being told to stop." The petition also stated that the petitioners believed that the matter had not been properly addressed by the Groton board of education, and they requested that the state board of education conduct a full investigation. Following the submission of the May 27, 1987 petition, commissioner of education Gerald N. Tirozzi notified the petitioners that the state board of education could not act upon the petition unless the petition conformed with the requirements of State Board of Education Regulations § 10-145a-10 (b), which provided that such a petition be submitted under oath.

Thereafter, on July 13, 1987, the petitioners submitted a verified petition and complaint to the state board of education. The verified petition and complaint was a more detailed version of the May 27, 1987 petition that had been revised to conform to the regulations. In the verified petition and complaint, Keith, McDermott, Sheets and Winkler requested that the state board of education "investigate the fitness of [the plaintiff] to hold a state teaching certificate and to revoke said certificate if, upon proper determination of the evidence, that revocation is warranted." They further stated that, "[o]n information and belief," there were grounds to revoke the plaintiff's teaching certificate including: (1) the plaintiff "has persistently neglected to perform the duties for which certification was granted"; and (2) the plaintiff is "professionally unfit to perform the duties for which certification was granted." The petitioners asserted as a basis for the request that: (1) the plaintiff conveyed to students the belief that females are mentally and morally inferior

to males; (2) he "sexualized" his classroom presentations causing his students to feel anger, embarrassment and fright; (3) he failed to cover the curriculum material for his courses; (4) he failed to set a good example regarding patience, fairness, compassion, and respect for the rights of others without regard to race, sex, religion or nationality; (5) students were "traumatized" by him; (6) he "repeatedly [verbally] abused" students; (7) he committed rough and hurtful batteries on male students; and (8) he touched female students against their will. The petitioners appended to the verified petition and complaint a number of affidavits signed by students and parents describing specific incidents of misconduct.

Despite the support for the defendants' assertions offered by the affidavits, the jury could reasonably have found that the defendants' statements were untrue, and that the defendants knew they were untrue, or acted with reckless disregard of the truth. In addition to sending the material to the state board of education, Sheets forwarded copies of the petition and complaint to the department of children and youth services (DCYS), the attorney general, and The New London Day newspaper. The jury could also reasonably have found that the plaintiff suffered harm as a result of the publication of the material. The defendants' exoneration therefore depends largely on the validity of their claims of privilege.

I

We first address the plaintiff's claim that the trial court improperly granted directed verdicts in favor of McDermott, Mitchell and Sawyer at the conclusion of the plaintiff's case-in-chief. The plaintiff asserts that because the publication of allegedly defamatory material by these three defendants was not absolutely priv-

ileged, the trial court's rulings were improper. We conclude that the trial court properly directed verdicts in favor of McDermott, Mitchell and Sawyer.

## A

Initially, McDermott, Mitchell and Sawyer claim that this court should not review the merits of the plaintiff's claims against them because the plaintiff failed to appeal the direction of verdicts in their favor in a timely fashion. We do not agree.

On January 19, 1990, the trial court directed verdicts in favor of McDermott, Mitchell and Sawyer, and ordered that the counts against them be dismissed. The jury's verdicts as to the other defendants were recorded on February 6, 1990. On February 9, 1990, the plaintiff moved the court to set aside the directed verdicts. His motion to set aside was denied. On June 8, 1990, the trial court issued written judgments regarding each of the original defendants, and on June 28, 1990, the plaintiff filed this appeal in the Appellate Court. On July 6, Sawyer and Mitchell moved the Appellate Court to dismiss the plaintiff's appeal pursuant to Practice Book § 4056[1] because it had not been timely filed, and on July 9, 1990, McDermott filed a similar motion. In their motions to dismiss, McDermott, Mitchell and Sawyer claimed that because the plaintiff had failed to file his appeal within twenty days of the directed verdicts in their favor, his appeal was untimely pursuant to

---

[1] Practice Book § 4056 provides: "Any claim that an appeal or writ of error should be dismissed, whether based on lack of jurisdiction, failure to file papers within the time allowed or other defect, shall be made by a motion to dismiss the appeal or writ. Any such motion must be filed in accordance with Secs. 4041 and 4042 within ten days after the filing of the appeal or the return day of the writ, or if the ground alleged subsequently occurs, within ten days after it has arisen, provided that a motion based on lack of jurisdiction may be filed at any time. The court may on its own motion order that an appeal be dismissed for lack of jurisdiction."

Practice Book § 4009.[2] They further claimed that the plaintiff's motion to set aside the verdicts, filed twenty-one days after the directed verdicts, was untimely under Practice Book § 320,[3] and ineffective to extend the appeal period pursuant to Practice Book § 4009. On October 9, 1990, the Appellate Court, sua sponte, ordered the trial court to articulate the dates when verdicts were directed in favor of McDermott, Mitchell and Sawyer, and to articulate when judgment was rendered with respect to those defendants. In response to the Appellate Court's order, the trial court articulated that it had directed verdicts for the defendants on January 19, 1990, and that judgment had been rendered on June 8, 1990. Following the articulation, the Appellate Court denied, without comment, the defendants' motions to dismiss the plaintiff's appeal. This court later transferred this case to itself pursuant to Practice Book § 4023.

The defendants now assert that this court should review the Appellate Court's denial of their motions to dismiss the plaintiff's appeal. In addition to the underlying substantive question of timeliness, this claim raises the question of whether this court may review an Appellate Court ruling denying a motion to dismiss an appeal as untimely, made prior to transfer pursuant to Practice Book § 4023. We decline to answer either

[2] Practice Book § 4009 provides in relevant part: "The party appealing shall, within twenty days, except where a different period is provided by statute, from the issuance of notice of the rendition of the judgment or decision from which the appeal is taken file an appeal in the manner prescribed by Sec. 4012; but if within the appeal period any motion is filed which, if granted, would render the judgment or decision ineffective, as, for example, a motion to open the judgment or to set aside the verdict or for judgment notwithstanding the verdict, the period of time for filing an appeal shall commence from the issuance of notice of the decision upon the motion or the expiration of the time within which a remittitur is ordered filed."

[3] Practice Book § 320 provides in relevant part: "[M]otions to set aside a verdict . . . must be filed with the clerk within five days after the day the verdict is accepted or judgment rendered . . . ."

of those questions, however, because we conclude that, pursuant to Practice Book § 4056, the Appellate Court had broad discretion to hear the appeal, whether timely filed or not. See *Connelly* v. *Doe,* 213 Conn. 66, 69–70 n.5, 566 A.2d 426 (1989). Even if a party to an appeal timely moves to dismiss an untimely appeal, the Appellate Court, and this court, continue to have discretion to hear the appeal.[4]

B

Next, McDermott claims that the plaintiff's assertion that the trial court improperly directed a verdict in McDermott's favor should be reviewed only if we conclude that the direction of the verdict was plain error. McDermott asserts that because the plaintiff failed to file a timely motion to set aside the directed verdict, he is limited to plain error review. We are not persuaded.

We have stated that "a motion to set aside a verdict is essential for a full review of claims of error," and that a party's failure to move to set aside a verdict "limits our consideration of the issues" to plain error review. *Pietrorazio* v. *Santopietro,* 185 Conn. 510, 515, 441 A.2d 163 (1981). General Statutes § 52-228b states

[4] In *Connelly* v. *Doe,* 213 Conn. 66, 70 n.5, 566 A.2d 426 (1989), we rejected a claim that a timely motion to dismiss defeated appellate jurisdiction over an untimely filed appeal. Although the opinion does not disclose the respective dates, the relevant records indicate that in that case the plaintiff's appeal was untimely filed on September 2, 1988, beyond the twenty day period required by Practice Book § 4009, and the defendant's motion to dismiss was timely filed on September 12, 1988, within the ten day period required by Practice Book § 4056. Nonetheless, we determined that the limited time for appeal was not jurisdictional and that our jurisdiction was not defeated by a timely motion to dismiss. Thus, although pursuant to Practice Book § 4056 an appellee must file a motion to dismiss within ten days of the filing of a late appeal in order to question the timeliness of the appeal; *Lareau* v. *Reincke,* 158 Conn. 486, 495, 264 A.2d 576 (1969); even if such a timely motion to dismiss is filed, the court retains the discretion to deny the motion and to hear the appeal.

that motions to set aside a verdict must be made in writing.[5] Further, Practice Book § 320 provides that a party must file a written motion to set aside a verdict "within five days after the day the verdict is accepted *or judgment rendered.*" (Emphasis added.) In this case, the trial court specifically articulated that judgment was not rendered on the directed verdict until June 8, 1990. The plaintiff filed his motion to set aside the verdict on February 9, 1990, nearly four months prior to the formal rendering of judgment. Therefore, we conclude that the plaintiff timely filed his motion to set aside the verdict.[6]

C

We next turn to the substance of the plaintiff's claim that the trial court improperly directed verdicts in favor of McDermott, Mitchell and Sawyer. The plaintiff first claims that McDermott, Mitchell and Sawyer, in answer to the plaintiff's complaint, made binding admissions that were sufficient to support a jury's verdict in his favor. Specifically, the plaintiff asserts that McDermott, Mitchell and Sawyer admitted publishing defam-

[5] General Statutes § 52-228b provides in relevant part: "No verdict in any civil action involving a claim for money damages may be set aside except on written motion by a party to the action, stating the reasons relied upon in its support, filed and heard after notice to the adverse party according to the rules of the court."

[6] In another section of his brief, McDermott asserts that because the motion to set aside was not filed within five days of the directed verdict, judgment was entered as a matter of law on the date that the verdict was directed. He also claims that the trial court's articulation that judgment was rendered on June 8, 1990, is erroneous. While McDermott now challenges the trial court's articulation, he failed to seek review of that articulation pursuant to Practice Book § 4054. See *Stamford Apartments Co.* v. *Stamford,* 203 Conn. 586, 590 n.1, 525 A.2d 1327 (1987). Moreover, he fails to cite any authority for the proposition that judgment is entered as a matter of law upon the direction of a verdict, regardless of the fact that the trial court later formally rendered judgment on the verdict. The cases he cites, *Pietrorazio* v. *Santopietro,* 185 Conn. 510, 513, 441 A.2d 163 (1981), and *Clime* v. *Gregor,* 145 Conn. 74, 76, 138 A.2d 794 (1958), are inapposite. Therefore, we will not review this claim.

atory material to other people not associated with the state board of education. He claims that the court improperly directed verdicts because the defendants failed to offer evidence that the communications to the "others" were privileged. We do not agree.

The plaintiff's substitute complaint, filed January 4, 1990, alleged that Sawyer published defamatory statements to the commissioner of the state board of education and several other people.[7] In her answer, Sawyer admitted "writing the statements," but denied that they were defamatory. The plaintiff further alleged that Sawyer approached "other persons" and made similar defamatory statements. Sawyer answered that she had repeated the allegations to others, but only on privileged occasions. Regarding Mitchell, the plaintiff alleged that she had published defamatory material to the commissioner of the state board of education and to "various persons."[8] Mitchell answered that she had written a statement, but denied that it was defamatory. The plaintiff further alleged that McDermott published defamatory statements to the state board of education and to others.[9] In answer, McDermott admit-

[7] The complaint states in relevant part that Sawyer "published in a writing to several persons including Gerald N. Tirozzi, Commissioner of the State [Board of Education,] and Robert Strouse, Principal of West Side Junior High School, Groton, Connecticut, a variety of unsubstantiated rumors and gossip and vicious claims based on hearsay, all of which accused the plaintiff of professional incompetence, moral and sexual impropriety and unwelcome physical contact with his students."

[8] The complaint specifically alleged that Mitchell "published in writing to various persons including Gerald N. Tirozzi, among many others, a variety of unsubstantiated rumors and remarks all of which accused the plaintiff of professional incompetence . . . ."

[9] The complaint alleged that McDermott "published in a writing to Mark Stapleton, Counsel to the State Board of Education, Gerald N. Tirozzi, Commissioner of the State Board of Education, Attorney General Joseph Lieberman, Amy B. Wheaton, Commissioner of the Department of Children and Youth Services, Joan D. Stipetic, Superintendent of Schools, Groton School System, among others . . . a variety of unsubstantiated rumors and gossip based on hearsay, unattributed and unprovable vicious claims

ted that he had repeated the allegations in the verified petition and complaint to "others," but only on privileged occasions.

Practice Book § 4185 provides that this court "shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The supreme court may in the interests of justice notice plain error not brought to the attention of the trial court." See *Williamson* v. *Commissioner of Transportation*, 209 Conn. 310, 316–17, 551 A.2d 704 (1988). The plaintiff did not raise the issue concerning the alleged admissions of the defendants in the trial court. Although the plaintiff, on January 16, 1990, filed a thirty-four page memorandum in opposition to the defendants' motions for a directed verdict, he made no reference to the admissions issue. Further, at oral argument on the motions for directed verdicts, when the plaintiff was called upon to present the evidence he was relying upon in opposition to those motions, he did not inform the court of his claim that the defendants had made admissions in their pleadings. Moreover, in view of the ambiguity of the defendants' answers and their questionable value as admissions, we are not persuaded that this unpreserved claim should be reviewed as plain error. Practice Book § 4185. We conclude that the trial court's action did not impair the integrity of the plaintiff's trial and that the interests of justice do not require plain error review. *Oakes* v. *New England Dairies, Inc.*, 219 Conn. 1, 8–9, 591 A.2d 1261 (1991).

D

The plaintiff next claims that he introduced sufficient evidence in his case-in-chief for the jury reasonably to

all of which accused the plaintiff of professional incompetency, moral and sexual impropriety and unwelcome physical contact with his students; however, said petition was without any basis in fact and said [defendant] recklessly proceeded with it nonetheless." It also alleged that McDermott "approached other persons" and made defamatory statements.

conclude that McDermott, Mitchell and Sawyer published nonprivileged, defamatory material concerning his professional and personal integrity. As a result, he claims that verdicts were improperly directed in their favor. We do not agree.

To find that the defendants were liable for defamation or intentional infliction of emotional distress as alleged in the plaintiff's complaint, the jury was required to find that the defendants published false statements that harmed the defendant, and that the defendants were not privileged to do so. " 'Directed verdicts are not favored.' " *Iseli Co.* v. *Connecticut Light & Power Co.*, 211 Conn. 133, 140, 558 A.2d 966 (1989). "A trial court should direct a verdict only when a jury could not reasonably and legally have reached any other conclusion. . . . In reviewing the trial court's decision to direct a verdict in favor of a defendant we must consider the evidence in the light most favorable to the plaintiff." (Citation omitted.) *Petyan* v. *Ellis,* 200 Conn. 243, 244, 510 A.2d 1337 (1986).

1

The plaintiff claims that the trial court improperly directed verdicts in favor of Mitchell and Sawyer at the conclusion of the plaintiff's case because they published statements that were not absolutely privileged. It is unnecessary for us to address the question of absolute privilege to conclude that the verdicts were properly directed in favor of Mitchell and Sawyer.

A party moving for a directed verdict "is entitled to have such a motion decided upon the basis of the evidence that has been presented at the time of the motion." *Wood* v. *Bridgeport,* 216 Conn. 604, 607, 583 A.2d 124 (1990). Regarding Mitchell and Sawyer, the record demonstrates that the plaintiff failed in his case-in-chief to offer any evidence to indicate that either defendant published statements concerning the plaintiff.

Concerning Mitchell, the only evidence offered in the plaintiff's case-in-chief was a sworn affidavit and complaint dated July 13, 1987, in which Mitchell described specific examples of inappropriate behavior by the plaintiff. Significantly, this affidavit and complaint were offered through the defendant Winkler, for the limited purpose of demonstrating Winkler's state of mind at the time she submitted the verified petition and complaint to the state board of education. The document was not offered for the substantive purpose of proving that Mitchell made damaging allegations.

Similarly, the evidence offered in the plaintiff's case-in-chief concerning Sawyer was admitted for the limited purpose of showing Winkler's state of mind. Winkler testified that Sawyer had stated that the plaintiff had made racist and sexist comments in the classroom. In response to an objection by the plaintiff, the court ruled that the statements made to Winkler by other people could be considered only for their effect on Winkler's mind. The defendant then introduced two letters written by Sawyer. The first was a letter from Sawyer to Winkler, in which Sawyer specifically described racist and sexist incidents that she claimed had occurred in the plaintiff's classroom. The second was a letter from Sawyer to the principal of West Side Junior High School that made similar accusations against the plaintiff. Both of these letters were introduced solely for the limited purpose of demonstrating Winkler's state of mind.[10]

In view of the limited purpose for the introduction of the evidence described, there was no evidence from

---

[10] Although Practice Book § 4065 (c) assigns the appellant the burden of providing this court with references to the pages of the record upon which he relies, the plaintiff fails to provide any citation that indicates that the Sawyer letters or the Mitchell affidavit, or any other evidence of defamatory statements by Mitchell or Sawyer, were admitted for substantive purposes at trial.

which the jury could reasonably have concluded that either Mitchell or Sawyer made defamatory statements about the plaintiff. Accordingly, we conclude that the trial court properly directed verdicts in favor of both Mitchell and Sawyer.[11]

### 2

In his case-in-chief, the plaintiff elicited the following evidence to prove that McDermott published defamatory material. McDermott testified that he had viewed affidavits of parents and students, and that he had viewed police reports that contained allegations concerning the plaintiff's behavior. Ultimately, McDermott signed the May 27, 1987 petition and the verified petition and complaint to which the affidavits and reports were appended, and sent them to the state board of education to request an investigation of the plaintiff. Although the verified petition and complaint were also forwarded to DCYS and the attorney general, there was no evidence offered in the plaintiff's case-in-chief from which a jury could reasonably have found that McDermott was responsible for that publication. The trial court ruled that McDermott's submission of the material to the state board of education was absolutely privileged.

The effect of an absolute privilege in a defamation action is that damages cannot be recovered for a defamatory statement even if it is published falsely and maliciously. *Petyan* v. *Ellis,* supra, 246.[12] " '[L]ike the

---

[11] Although the trial court apparently relied on the doctrine of absolute privilege in directing verdicts in favor of Mitchell and Sawyer, "this court is authorized to rely upon alternative grounds supported by the record to sustain a judgment." *Henderson* v. *Department of Motor Vehicles,* 202 Conn. 453, 461, 521 A.2d 1040 (1987).

[12] The plaintiff asserts that *Petyan* v. *Ellis,* 200 Conn. 243, 510 A.2d 1337 (1986), is inapposite and that the issues of privilege to publish defamatory material are governed by our decision in *McHale* v. *W.B.S. Corporation,* 187 Conn. 444, 446 A.2d 815 (1982). *McHale* concerns the standard of care

privilege which is generally applied to pertinent statements made in formal judicial proceedings, an absolute privilege also attaches to relevant statements made during administrative proceedings which are "quasi-judicial" in nature.' *Mock* v. *Chicago, Rock Island & Pacific R.R. Co.,* 454 F.2d 131, 133 (8th Cir. 1972); *Thomas* v. *Petrulis,* 125 Ill. App. 3d 415, 419, 465 N.E.2d 1059 (1984); *Richardson* v. *Dunbar,* 95 Ill. App. 3d 254, 256, 419 N.E.2d 1205 (1981); *Circus Circus Hotels, Inc.* v. *Witherspoon,* [99 Nev. 56, 61, 657 P.2d 101 (1983)]." *Petyan* v. *Ellis,* supra, 246–47. Once it is determined that a proceeding is quasijudicial in nature, the absolute privilege that is granted to statements made in furtherance of it "extends to every step of the proceeding until final disposition." Id., 246.

We must first determine whether the proceedings in this case were quasijudicial in nature. "The judicial proceeding to which [absolute] immunity attaches has not been defined very exactly. It includes any hearing before a tribunal which performs a judicial function, ex parte or otherwise, and whether the hearing is public or not. It includes for example, lunacy, bankruptcy, or naturalization proceedings, and an election contest. It extends also to the proceedings of many administrative officers, such as boards and commissions, so far as they have powers of discretion in applying the law to the facts which are regarded as judicial or quasi-judicial, in character." (Internal quotation marks omitted.) Id.; W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 114, pp. 818–19.

In *Petyan,* we considered a number of factors in determining whether the proceedings in that case were quasijudicial in nature. There, the plaintiff had claimed that she was entitled to unemployment benefits from

required of a defendant in a case alleging malicious prosecution. The defendant has not pleaded malicious prosecution and we do not find our analysis in *McHale* applicable to the facts of this case.

the state. To evaluate her claim properly, the employment security division of the state department of labor requested that her former employer, the defendant, submit to it the reasons why the plaintiff had left his employ. The plaintiff subsequently alleged that the defendant's submission to the state was defamatory. We determined that the employment security division acted as a quasijudicial body, and that the defendant's statements were protected by an absolute privilege. We noted that the employment security division had the power to determine facts and to apply the appropriate law to those facts. *Petyan* v. *Ellis,* supra, 248–49. We also recognized that the employment security division possessed subpoena power, and that the defendant was required to certify that the information he forwarded to the state was true and correct. Id., 250.

Other jurisdictions have also outlined a number of factors that assist in determining whether a proceeding is quasijudicial in nature. Among them are whether the body has the power to: (1) exercise judgment and discretion; (2) hear and determine or to ascertain facts and decide; (3) make binding orders and judgments; (4) affect the personal or property rights of private persons; (5) examine witnesses and hear the litigation of the issues on a hearing; and (6) enforce decisions or impose penalties. *Thomas* v. *Petrulis,* 125 Ill. App. 3d 415, 419–20, 465 N.E.2d 1059 (1984). Further, it is important to consider whether there is a sound public policy reason for permitting the complete freedom of expression that a grant of absolute immunity provides. W. Prosser & W. Keeton, supra, § 114, p. 816.

General Statutes § 10-145b (m), empowers the state board of education to revoke a teaching certificate.[13]

---

[13] General Statutes § 10-145b (m) provides in relevant part: "The state board of education may revoke any certificate issued pursuant to sections 10-144o to 10-149, inclusive, for any of the following reasons: (1) The holder of the certificate obtained such certificate through fraud or misrepresen-

At the time that the verified petition and complaint were filed, any such revocation proceeding had to conform to the State Department of Education Regulations § 10-145a-10.[14] That regulation allowed decertification of a teacher for several well delineated causes. It provided that a request for revocation, made

tation of a material fact; (2) the holder has persistently neglected to perform the duties for which certification was granted; (3) the holder is professionally unfit to perform the duties for which certification was granted; (4) the holder is convicted in a court of law of a crime involving moral turpitude or of any other crime of such nature that in the opinion of the board continued certification would impair the standing of certificates issued by the board; or (5) other due and sufficient cause. Revocation shall be in accordance with procedures established by the state board of education pursuant to chapter 54."

General Statutes § 10-145 provides in relevant part: "(a) No teacher, supervisor, administrator, special service staff member or school superintendent shall be employed in any of the schools of any local or regional board of education unless such person possesses an appropriate state certificate, nor shall any such person be entitled to any salary unless such person can produce such certificate dated previous to or the first day of employment . . . ."

[14] State Board of Education Regulation § 10-145a-10, which was in effect at the time that the defendants filed the verified petition and complaint with the state board of education, states:

"(a) Causes. Any certificate issued under § 10-145a of the general statutes by the State Board of Education, hereinafter called 'the board,' may be revoked by the board in accordance with procedures hereinafter established if the board finds that one or more of the following just causes exist:

"(1) The holder of the certificate, hereinafter called the 'holder,' obtained the certificate through fraud or the misrepresentation of a material fact;

"(2) the holder has persistently neglected to perform the duties for which certification was granted;

"(3) the holder is professionally unfit to perform the duties for which certification was granted;

"(4) the holder is convicted in a court of law of a crime involving moral turpitude or of any other crime of such nature that in the opinion of the board continued certification would impair the standing of certificates issued by the board;

"(5) other due and sufficient cause.

"(b) Request for revocation. A request for revocation of a certificate may be made by a board of education through its secretary or by any person or persons with a legitimate interest involved, hereinafter called 'the requesting party.' Such request shall be in writing, signed and acknowledged before

under oath, had to be filed with the secretary of the state board of education. Upon receipt of such request, the state board of education had to conduct a preliminary inquiry to determine whether probable cause for revocation of the certificate existed. If probable cause was found, the state board of education was required to provide detailed notification to the holder of the teaching certificate that decertification proceedings

a person authorized to administer oaths, and shall state in reasonable detail, including relevant names of persons, dates and places, the grounds upon which revocation is requested. Any request shall be filed with the Secretary of the State Board of Education.

"(c) Preliminary inquiry. Procedures directed toward the revocation of a certificate may be instituted by the board upon receipt of such request only after the board, through its secretary has made or caused to be made a preliminary inquiry to determine whether probable cause exists for instituting such procedures. If the board, as a result of such inquiry, finds that in its judgment probable cause does not exist for the instituting of revocation procedures, it shall enter upon its minutes a written record of such finding, which record shall be made available, on request to the holder and to the requesting party.

"(d) Notice to holder of certificate. If the board, as a result of its inquiry, finds that probable cause does exist, the secretary of the board shall forthwith send by registered mail to the holder notice that the board is instituting procedures directed toward the revocation of his or her certificate. Such notice shall contain a statement in reasonable detail of the grounds, including relevant names of persons, dates, and places, upon which revocation procedures have been instituted, and shall contain also the name and address of the requesting party. Such notice shall contain further a statement in writing that the holder may, within fifteen days after receiving the notice, either

"(1) surrender his or her certificate to the secretary of the board and thereby terminate his or her right to serve in a position requiring such certificate, and state in writing that he or she waives his or her right to a hearing as provided in this section; or

"(2) request in writing a hearing before the board. Copies of such notice shall be sent to the requesting party and to the secretary of the board of education of the town in which the holder is employed or was last employed in a position requiring certification, hereinafter called 'the secretary of the local board.'

"(e) Provision of hearings. If no request for a hearing is made by the holder, the board may, on its own motion made not later than thirty-one days after the expiration of the aforesaid fifteen days' notice period, order a hearing to be held. If no hearing is held, the secretary of the board shall

were being considered. The holder of the certificate could then surrender his certificate or demand a public hearing. At the hearing, the holder was entitled to be heard, to examine the records of investigations, to be present throughout the hearing, to be represented by counsel, to call and cross-examine witnesses and to present oral argument. At the conclusion of the hearing, the state board of education was required to state in writing the reasons for its decision and to notify all parties to the proceedings.

make or cause to be made an investigation of the matters set forth in the notice and file a written report thereon with the board at a meeting of the board not more than sixty days following the expiration of the aforesaid fifteen days' notice period. If a hearing is requested by the holder or if the board orders a hearing on its own motion, such hearing shall be held not later than thirty-one days following such request or such order by the board. Not less than twenty-one days' notice of such hearing shall be given to the holder, to the requesting party and to the secretary of the local board.

"(f) Hearing procedure. The hearing shall be conducted by the board with at least two-thirds of the members of the board present and shall be public if the holder so specifies. A verbatim transcript of the hearing shall be made and shall be supplied to all members of the board, to the holder, to the requesting party, and to the secretary of the local board. Both the holder and the requesting party shall have the right to examine the record of any prior investigations and proceedings in the case, to be heard in each other's presence, to be present throughout the hearing and to be represented by counsel who shall be given reasonable opportunity to call witnesses, to cross-examine adverse witnesses, to present oral argument, and, within thirty-one days following the hearing, to file briefs.

"(g) Decision by the board. The board, within thirty-one days after the closing of the record of the hearing, or after filing of the secretary's written report if no hearing is held, shall determine by a recorded roll-call vote whether or not the certificate of the holder shall be revoked, an affirmative vote of a two-thirds of the full membership of the board being necessary for revocation. Each member of the board who votes shall certify either that he or she has attended, or read the transcript of, the hearing, or that he or she has read the secretary's written report if no hearing has been held. The board shall state in a written opinion the reasons for its action and shall base its determination on the evidence adduced at the hearing or, if no hearing is held, upon the secretary's written report. Notice of the action of the board, together with its written opinion supporting its action, shall be promptly furnished by the secretary of the board to all parties to the proceedings."

The substance of § 10-145a-10 is currently set forth in State Board of Education Regulations § 10-145d-109.

The foregoing clearly demonstrates that the state board of education possessed significant regulatory authority to conduct proceedings of a quasijudicial nature. The detailed procedures, which ensure the reliability of teacher decertification proceedings, and the compelling public policy concern for the protection of school age children persuade us that the decertification proceedings before the state board of education were quasijudicial in nature, and that any statements made as a requisite step in those proceedings were absolutely privileged. See *Brody* v. *Montalbano,* 87 Cal. App. 3d 725, 151 Cal. Rptr. 206 (1978), cert. denied, 444 U.S. 844, 100 S. Ct. 87, 62 L. Ed. 2d 57 (1979); *Weissman* v. *Mogol,* 118 Misc. 2d 911, 462 N.Y.S.2d 383 (1983).

Having concluded that a decertification proceeding before the state board of education is quasijudicial in nature, we must determine whether McDermott's submission of the verified petition and complaint was a step in that proceeding. We have stated that allegations contained within a complaint in a quasijudicial proceeding are absolutely privileged. *DeLaurentis* v. *New Haven,* 220 Conn. 225, 263, 597 A.2d 807 (1991). State Board of Education Regulations § 10-145a-10 (b) (now § 10-145a-109 [b]) specifically provides that a "request for revocation of a certificate may be made by . . . any person or persons with a legitimate interest involved . . . ." Such a request was necessary under the circumstances to initiate the decertification process as contemplated by § 10-145a-10. We conclude, therefore, that any statements made by McDermott in his verified petition and complaint filed pursuant to § 10-145a-10 (c) were absolutely privileged and could not provide the basis for liability in a defamation action.[15] Accordingly, the trial court properly directed a verdict in his favor.

[15] Because the plaintiff's intentional infliction of emotional distress cause of action was founded upon the same conduct as his defamation claim, abso-

## II

We next address the cross appeal of Bonney and Sheets, against whom the jury returned a verdict of $10,000. Their cross appeal raises additional issues concerning the scope of absolute privilege in a decertification proceeding. Bonney and Sheets claim that they were entitled to judgments notwithstanding the verdict because any defamatory material they published was absolutely privileged. We agree.

### A

Regarding the publication of defamatory material by Bonney, the evidence allowed the jury reasonably to find the following. Bonney drafted a letter to the state board of education that described inappropriate conduct by the plaintiff, and she submitted the letter to Sheets to be forwarded to the state along with the verified petition, complaint and other attachments. Additionally, Bonney telephoned Janice Waller, believing that Waller might have information concerning the plaintiff's conduct. Bonney had telephoned Waller to enlist Waller's support for the verified petition and complaint that was to be submitted to the state board of education. During the conversation with Waller, Bonney stated that her paper girl had been "molested or attacked or something" by the plaintiff. Waller testified that she assumed that Bonney's allegations about the plaintiff were of a sexual nature. There was no further evidence offered to indicate that Bonney had communicated, or had attempted to communicate, her paper girl's allegations to any other potential witnesses, or that Bonney published any other defamatory material.

lute privilege also bars recovery on that claim. *Petyan* v. *Ellis,* 200 Conn. 243, 252–53, 510 A.2d 1337 (1986).

"[I]n instances where communications are made to alleged potential witnesses, the court must particularly evaluate the factual circumstances peculiar to each case to determine whether application of [absolute] privilege is warranted." *Hoover* v. *Van Stone,* 540 F. Sup. 1118, 1123 (D. Del. 1982). In *Hoover,* the defendant in a defamation case published an assertion that the plaintiff had misled him into purchasing shares in financially troubled corporations. Id., 1120. The defendant had filed suit against the plaintiff alleging violations of federal securities laws, and had contacted a number of potential witnesses to inform them of allegations made against the plaintiff in his complaint. Id., 1123. The defendant described his version of the plaintiff's conduct and asked the potential witnesses if they had had similar experiences with the plaintiff. Id. Because the communications in that case were "made to a limited and discrete group," made in the "preparation of [the] plaintiff's case," made "for the purpose of obtaining evidence for trial" and necessary to "engage effectively in the investigation needed to prepare intelligently for trial," the court concluded that they were absolutely privileged. Id.

Similarly, in *Brody* v. *Montalbano,* supra, 729, the parents of school children, defendants in a defamation action brought by a teacher, filed a formal complaint with the local school board against the teacher. In the complaint, the parents alleged that the teacher had made inappropriate comments to a student and had failed to follow proper procedures following the injury of one of his students. The defendants apparently had discussed the content of their complaint with other parents. Id., 733. The court held: "It appears that [absolute] privilege extended to the defendant parents' communications with the [other parents]. To accomplish the purpose of judicial or quasi-judicial proceedings, it is obvious that the parties or persons interested must

confer and must marshal their evidence for presentation at the hearing. The right of private parties to combine and make presentations to an official meeting and, as a necessary incident thereto, to prepare materials to be presented is a fundamental adjunct to the right of access to judicial and quasi-judicial proceedings. To make such preparations and presentations effective, there must be an open channel of communication between the persons interested and the forum, unchilled by the thought of subsequent judicial action against such participants; provided always, of course, that such preliminary meetings, conduct and activities are directed toward the achievement of the objects of the litigation or other proceedings." (Internal quotation marks omitted.) Id., 734.

It is uncontradicted that Bonney's discussion with Waller was conducted for the purpose of marshaling evidence against the plaintiff to be used to support the complaint that was to be submitted to the state board of education. The evidence reveals no communication of a similar nature by Bonney to any other person. Accordingly, given the particular factual circumstances of Bonney's communications, we conclude that the discussion with Waller and her submission of her written complaint to Sheets were absolutely privileged. Therefore, the trial court improperly denied her motion for a judgment notwithstanding the verdict.

### B

Regarding Sheets, the jury could reasonably have found the following defamatory publications. Sheets prepared the verified petition and complaint and attached affidavits and forwarded copies of those documents to DCYS, the attorney general and the state board of education. Further, Sheets was requested by an editorial writer for The New London Day to provide The Day with a copy of the petition and complaint

that had been sent to the state board of education. Sheets provided the writer with a copy of the verified petition and complaint, but not with the affidavits of parents and students that had been attached. No evidence was offered to indicate that Sheets published any other statements to The Day. The trial court instructed the jury that the verified petition and complaint, and attached statements, that were sent to the state board of education, DCYS, and the attorney general were absolutely privileged.[16] Accordingly, the jury's verdict against Sheets must necessarily have been founded upon her publication to The Day. Sheets claims that her publication of the complaint and petition to The Day was absolutely privileged.

Although we have concluded that the decertification proceedings before the state board of education were quasijudicial in nature, not all communications relating to that topic are necessarily absolutely privileged. "In determining whether an occasion is absolutely privileged, the pivotal factor is frequently to whom the matter is published." *Asay* v. *Hallmark Cards, Inc.,* 594 F.2d 692, 697 (8th Cir. 1979). " 'The privilege may be lost by unnecessary or unreasonable publication to one for whom the occasion is not privileged.' " *Kleier*

---

[16] "The Plaintiff cannot recover any damages for any material prepared and sent to the State Board of Education or as part of the judicial proceeding or quasi-judicial proceeding, anything sent to the Department of Children and Youth Services or to the Attorney General's Office, because that was all part of this proceeding. So, with respect to all of those statements, Plaintiff cannot recover because these statements were made under a privilege of absolute immunity.

"Again, let me review that all statements made to the State Board of Education, DCYS, Attorney General's Office, are protected as part of quasi-judicial proceedings and are given the privilege of absolute immunity. This applies, specifically, so that we all know what we're talking about, that applies to the verified petition and complaint and all the attachments thereto, that were sent to the State Board of Education, DCYS and the Attorney General's Office, cannot be any recovery for any of that information sent to those three organizations."

*Advertising, Inc.* v. *Premier Pontiac, Inc.,* 921 F.2d 1036 (10th Cir. 1990); *Asay* v. *Hallmark Cards, Inc.,* supra, 698; *Kirschstein* v. *Haynes,* 788 P.2d 941, 951 n.27 (Okla. 1990).

"Publication to the news media is not ordinarily sufficiently related to a judicial proceeding to constitute a privileged occasion." *Asay* v. *Hallmark Cards, Inc.,* supra, 697; *Hoover* v. *Van Stone,* supra; *Pelagatti* v. *Cohen,* 370 Pa. Super. 422, 437, 536 A.2d 1337 (1987), appeal denied, 519 Pa. 667, 548 A.2d 256 (1988). Therefore, " 'unnecessary publication to the news media may result in loss of privilege. . . .' " *Kleier Advertising, Inc.* v. *Premier Pontiac, Inc.,* supra, 1043; *Asay* v. *Hallmark Cards, Inc.,* supra, 698; *Kirschstein* v. *Haynes,* supra, 951 n.27. Publication to the media is ordinarily not privileged because "[t]he salutary policy of allowing freedom of communication in judicial proceedings does not warrant or countenance the dissemination and distribution of defamatory accusations outside of the judicial proceeding. No public purpose is served by allowing a person to unqualifiedly make libelous or defamatory statements about another, but rather such person should be called upon to prove the correctness of his allegations or respond in damages. The privilege or immunity granted to defamatory statements in judicial proceedings is a narrow one." *Asay* v. *Hallmark Cards, Inc.,* supra.

Publication to the media of material that the media was independently entitled to view, however, cannot provide a basis for a claim of defamation. See *DeLaurentis* v. *New Haven,* supra, 265–66; *Green Acres Trust* v. *London,* 142 Ariz. 12, 25, 688 P.2d 658 (1983). In *DeLaurentis* we concluded that the mayor's publication to the media of material contained within a formal summons was entitled to the protection of an absolute privilege. The pivotal question here is whether, regardless of the actions of the defendant, the media

would have been entitled to access to the complaint. We are aware of no persuasive justification for punishing Sheets for publication to The Day of the formal written complaint and petition if The Day was independently permitted to view the material.

The Freedom of Information Act provides in General Statutes §§ 1-18a and 1-19 that any person has a right to inspect recorded material that is in the possession of a state agency and that relates to the conduct of the public's business.[17] Plainly, the verified petition and complaint filed with the state board of education conforms to that description, and the plaintiff apparently concedes that the verified petition and complaint are public records pursuant to the Freedom of Information Act. He argues, however, that pursuant

[17] General Statutes § 1-18a provides in relevant part: "As used in this chapter, the following words and phrases shall have the following meanings, except where such terms are used in a context which clearly indicates the contrary . . . .

"(d) 'Public records or files' means any recorded data or information relating to the conduct of the public's business prepared, owned, used, received or retained by a public agency, whether such data or information be handwritten, typed, tape-recorded, printed, photostated, photographed or recorded by any other method."

General Statutes § 1-19 provides in relevant part: "(a) Except as otherwise provided by any federal law or state statute, all records maintained or kept on file by any public agency, whether or not such records are required by any law or by any rule or regulation, shall be public records and every person shall have the right to inspect such records promptly during regular office or business hours or to receive a copy of such records in accordance with the provisions of section 1-15. Any agency rule or regulation or part thereof, that conflicts with the provisions of this subsection or diminishes or curtails in any way the rights granted by this subsection shall be void. Each such agency shall keep and maintain all public records in its custody at its regular office or place of business in an accessible place and, if there is no such office or place of business, the public records pertaining to such agency shall be kept in the office of the clerk of the political subdivision in which such public agency is located or of the secretary of the state, as the case may be. Any certified record hereunder attested as a true copy by the clerk, chief or deputy of such agency or by such other person designated or empowered by law to so act, shall be competent evidence in any court of this state of the facts contained therein. Each such agency shall make, keep and maintain a record of the proceedings of its meetings."

to General Statutes § 10-151c,[18] the material constitutes a record of teacher performance and evaluation and, therefore, is not open to public view.

We have recently observed that in enacting General Statutes § 10-151c, the legislature was apparently attempting to clarify the legislative intent of General Statutes § 1-19 (b) (2).[19] *Rose* v. *Freedom of Information Commission*, 221 Conn. 217, 234, 602 A.2d 1019 (1992); *Board of Education* v. *Freedom of Information Commission*, 210 Conn. 590, 594, 556 A.2d 592 (1989). "In exempting 'records of teacher performance and evaluation,' the legislature intended to preserve such files from unrestricted public access, in the same manner as otherwise provided in § 1-19 (b) (2)." *Rose* v. *Freedom of Information Commission*, supra. "Although we have perceived a legislative intention reflected in the Freedom of Information Act to balance the public's right to know what its agencies are doing with the governmental and private needs for confidentiality, we have also recognized that the general rule is disclosure and that exceptions will be narrowly construed." (Internal quotation marks omitted.) Id., 233. We conclude that, on the particular facts of this case, the allegations by students, parents and community members concerning the plaintiff's conduct that were submitted to the state board of education pursuant to

---

[18] General Statutes § 10-151c provides in relevant part: "Any records maintained or kept on file by any local or regional board of education which are records of teacher performance and evaluation shall not be deemed to be public records and shall not be subject to the provisions of section 1-19, provided that any teacher may consent in writing to the release of his records by a board of education. Such consent shall be required for each request for a release of such records. For the purposes of this section the term 'teacher' shall include each certified professional employee below the rank of superintendent employed by a board of education in a position requiring a certificate issued by the state board of education."

[19] General Statutes § 1-19 (b) (2) provides in relevant part that the disclosure of personnel files that would constitute an invasion of privacy is not mandated by the Freedom of Information Act.

its regulations do not constitute "records of teacher performance and evaluation" as contemplated by § 10-151c. Id., 234. Accordingly, because The Day had a statutory right to the information provided by Sheets, Sheets was entitled to a judgment notwithstanding the verdict.[20]

## III

The jury returned verdicts in favor of three individual defendants, Keith, Neilson and Winkler. The plaintiff maintains that he is entitled to a new trial with regard to these defendants because the trial court misinstructed the jury: (1) by characterizing a teacher as a public official for defamation purposes; (2) by failing to give an instruction concerning circumstantial evidence; (3) by giving an instruction concerning the doctrine of "fair comment"; (4) by giving an instruction about absolute privilege that encompassed communications to the state board of education, the department of children and youth services, and the attorney general; and (5) by failing to give an instruction permitting the jury to award general damages for injury to the plaintiff's reputation. We do not agree.

## A

With respect to the plaintiff's status as a public official, evidence was offered indicating that the plaintiff had been a public school science teacher at the West Side Junior High School in Groton for nineteen years. The trial court instructed the jury that the plaintiff, as a teacher, was a public official as a matter of law, and that he could not recover damages unless he was

---

[20] We note that, in deciding that Sheets was entitled to a judgment notwithstanding the verdict, we do not address the question of whether publication to DCYS and the attorney general was absolutely privileged. Because the jury was instructed that such publication was absolutely privileged, and the plaintiff has not adequately challenged the propriety of that instruction, we limit our analysis to Sheets' publication to The Day.

able to demonstrate by clear and convincing proof that the statements made by the defendants were false and made with actual malice. Following that charge, the plaintiff properly took exception.

In an action for defamation, a public official is prohibited from recovering damages for a defamatory falsehood relating to his official conduct unless he proves by clear and convincing evidence that the falsehood was published with "actual malice." *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 279–80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964); *Brown* v. *K.N.D. Corporation,* 205 Conn. 8, 10, 529 A.2d 1292 (1987), *Holbrook* v. *Casazza,* 204 Conn. 336, 342, 528 A.2d 774 (1987), cert. denied, 484 U.S. 1006, 108 S. Ct. 699, 98 L. Ed. 2d 651 (1988). The state of mind that constitutes actual malice has been defined as " 'with knowledge that it was false or with reckless disregard of whether it was false or not.' " *Brown* v. *K.N.D. Corporation,* supra.

Although the United States Supreme Court has not definitively resolved the question of "how far down into the lower ranks of government employees the 'public official' designation would extend"; *New York Times Co.* v. *Sullivan,* supra, 283 n.23; it is clear that not all public employees are included within that category. *Hutchinson* v. *Proxmire,* 443 U.S. 111, 119 n.8, 99 S. Ct. 2675, 61 L. Ed. 2d 411 (1979). The question of whether a school teacher is a public official for defamation purposes is one of first impression in this state.[21]

---

[21] A review of other jurisdictions reveals that there is a split of authority on this question. Several jurisdictions have concluded that teachers are public officials. See *Sewell* v. *Brookbank,* 119 Ariz. 422, 425, 425, 581 P.2d 267 (1978); *Basarich* v. *Rodeghero,* 24 Ill. App. 3d 889, 892–93, 321 N.E.2d 739 (1974); *Luper* v. *Black Dispatch Publishing Co.,* 675 P.2d 1028, 1031 (Okla. App. 1983). Other jurisdictions have disagreed. See *Franklin* v. *Benevolent & Protective Order of Elks, Lodge No. 1108,* 97 Cal. App. 3d 915, 924, 159 Cal. Rptr. 131 (1979); *True* v. *Ladner,* 513 A.2d 257, 263–64 (Me. 1986); *Richmond Newspapers, Inc.* v. *Lipscomb,* 234 Va. 277, 287, 362 S.E.2d 32 (1987); *Poe* v. *San Antonio Express-News Corporation,* 590 S.W.2d 537, 540 (Tex. Civ. App. 1979).

In determining whether a particular individual holds the status of a public official, courts have remarked on various significant considerations. The United States Supreme Court indicated that the underlying purpose of limiting an individual's ability to protect his reputation was to allow citizens to voice their opinions more freely on matters of public concern. *New York Times Co.* v. *Sullivan,* supra, 270. "[D]ebate on public issues should be uninhibited, robust, and wide-open, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." Id. "[T]he 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt* v. *Baer,* 383 U.S. 75, 85, 86 S. Ct. 669, 15 L. Ed. 2d 597 (1966); *Moriarty* v. *Lippe,* 162 Conn. 371, 378, 294 A.2d 326 (1972). Additionally, it is important to consider whether "a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and importance of all government employees . . . ." *Rosenblatt* v. *Baer,* supra, 86; *Moriarty* v. *Lippe,* supra. Further, it has been postulated that public figures require less protection from defamation because they tend to enjoy greater access to the media for purposes of rebutting any defamatory publication. *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323, 344, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974).

Taking into account these considerations, we conclude that a public school teacher is a public official for defamation purposes. Robust and wide open debate concerning the conduct of the teachers in the schools of this state is a matter of great public importance. In *Moriarty* v. *Lippe,* supra, we indicated that a police

patrolman is a public official. There we noted that "a patrolman's office, if abused, has great potential for social harm and thus invites independent interest in the qualifications and performance of the person who holds the position." Id., 378. We also stated that the patrolman "has, or appears to the public to have, substantial responsibility for or control over the conduct of government affairs, at least where law enforcement and police functions are concerned . . . ." Id. Similarly, teachers' positions, if abused, potentially might cause serious psychological or physical injury to school aged children. Unquestionably, members of society are profoundly interested in the qualifications and performance of the teachers who are responsible for educating and caring for the children in their classrooms. Further, teachers exercise almost unlimited responsibility for the daily implementation of the governmental interest in educating young people. In the classroom, teachers are not mere functionaries. Rather, they conceive and apply both policy and procedure. As a result of that significant public interest, it is also likely that the media would not only provide a teacher about whom allegations have been made with an opportunity to respond, but that the media would encourage comment by the teacher. Therefore, we conclude that the trial court properly instructed the jury that the plaintiff school teacher was a public official for defamation purposes.

## B

The plaintiff further claims that the trial court improperly failed to instruct the jury concerning circumstantial evidence, and that in the absence of such an instruction the jury was not adequately prepared to determine whether the defendants acted with malice. We conclude that the instructions in this regard were adequate.

Prior to deliberations, the plaintiff filed a written request to charge, asking the trial court to instruct the jury that it could rely on circumstantial evidence to determine the "purpose, intention or knowledge" of the defendants. He also requested that the court provide a definition of circumstantial evidence. In its instruction to the jury, however, the trial court did not instruct as the plaintiff had specifically requested. Rather, the court instructed the jury: "You are the sole judges of the facts. You must decide what the true facts are, apply the law that I give to you to those facts and base your verdict upon the evidence you've heard, the exhibits and the law that I give to you . . . using your own experience in life, determine what testimony you find to be credible or believable and what you do not, and you take the believable testimony and from that determine what the true facts are." The court also informed the jury that the plaintiff had to prove that the defendants had acted with malice and that "[i]n determining whether there was such malice on the part of the respective Defendants, you must consider the time, place and manner of the making of the statement, its language and all the circumstances surrounding the making of it as you find them to have existed, including the intention . . . the respective Defendants had and any attempts they made to ascertain whether or not the assertions were true."

We have stated that "[t]riers of fact must often necessarily rely on circumstantial evidence and draw inferences from it." *Cayer* v. *Salvatore,* 150 Conn. 361, 363, 189 A.2d 505 (1963); *Boehm* v. *Kish,* 201 Conn. 385, 389, 517 A.2d 624 (1986). Moreover, "[o]rdinarily, intent can only be proved by circumstantial evidence; it may be and usually is inferred from the defendant's conduct." *State* v. *Montanez,* 219 Conn. 16, 20, 592 A.2d 149 (1991); *State* v. *Carpenter,* 214 Conn. 77, 82, 570 A.2d 203 (1990). In one instance, we concluded that

a trial court's failure to provide a specific instruction on circumstantial evidence resulted in harmful error. *Orico* v. *Williams,* 139 Conn. 714, 97 A.2d 556 (1953).

"The test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Jury instructions need not be exhaustive, perfect or technically accurate, so long as they are correct in law, adapted to the issues and sufficient for the guidance of the jury." (Citations omitted; internal quotation marks omitted.) *Preston* v. *Keith,* 217 Conn. 12, 17, 584 A.2d 439 (1991).

In *Orico* v. *Williams,* supra, we concluded that the court's failure to instruct on circumstantial evidence, in conjunction with other instructions that operated to exaggerate the prejudice caused by the omission of that instruction, constituted reversible error. The particular facts of this case, however, do not support a similar conclusion. Although the court might properly have provided a more specific instruction concerning the definition and function of circumstantial evidence, the instruction given was adequate to guide the jury. The trial court informed the jury that it should look at all of the evidence in determining whether the defendants had acted with malice. Specifically, the court informed the jury that it should consider the defendants' statements, "and all the circumstances surrounding the making of [them]," in determining whether they had acted with malice. The trial court also informed the jury that in determining whether the defendants had maliciously published false material, it should consider how diligently the defendants had investigated the truth of the assertions they forwarded to the state board of education. Additionally, unlike the charge in *Orico* v. *Williams,* supra, nothing in the trial court's instruc-

tions indicated that the jury should rely solely upon direct evidence. Therefore, the trial court's instructions concerning circumstantial evidence, while sparse, were adequate.

## C

The plaintiff also claims that he is entitled to a new trial because the trial court committed plain error in that it improperly instructed the jury concerning the doctrine of "fair comment" in a defamation case. Specifically, the plaintiff claims that the trial court should not have instructed the jury on the issue of fair comment because this case concerns defendants who voluntarily injected themselves into the public scene. He also asserts that the major portion of the defamation alleged in this case was in the form of statements of fact rather than opinion. Finally, he claims that the instruction was improper because it failed to inform the jury fully of the circumstances under which the doctrine of fair comment is applicable. We conclude that the plaintiff has not raised an issue that merits plain error analysis.

The plaintiff did not file a request to charge on the issue of fair comment. In its instruction to the jury the trial court stated that a conditional privilege "applies to statements made as fair comment about matters of public concern." Following the instruction, the plaintiff took exception to the fact that the trial court charged "at all on fair comment, because fair comment does not apply to non-media Defendants."

Because the plaintiff apparently does not press on appeal his claim that fair comment applies only to media defendants, that claim is considered abandoned. His remaining claims regarding fair comment are unpreserved. Therefore, the plaintiff may not prevail unless the fair comment issues he raised constitute plain error. Practice Book § 4185. They do not. *Oakes* v. *New*

*England Dairies, Inc.,* 219 Conn. 1, 8–9, 591 A.2d 1261 (1991) (integrity of the plaintiff's trial not impaired; injustice not done).

### D

The plaintiff also claims that the trial court improperly instructed the jury that publication of defamatory material to the state board of education, DCYS and the attorney general was absolutely privileged. We have addressed the question of publication to the state board of education above. We decline to review the question of publication to DCYS and the attorney general because the issues are inadequately briefed. The plaintiff has failed to provide us with a sufficient review of the applicable case law and statutory and regulatory provisions to allow us to make a determination of whether publication to those agencies would constitute a step in the course of a judicial or quasijudicial proceeding. Without adequate briefing, we have no basis to conclude that the trial court was incorrect when it instructed the jury that absolute privilege applied to publication to those entities.

### E

Next, the plaintiff claims that he is entitled to a new trial because the trial court improperly failed to instruct the jury that it was permitted to award the plaintiff general damages for injury to his reputation. He asserts that because several of the statements published by the defendants constituted defamation per se, he was not obligated to plead or prove harm to reputation as a prerequisite to recovery of general damages for such harm. In view of our resolution of the preceding issues, it is unnecessary to address this claim. Even if the instruction were improper, it could not have affected the result of this case. We have concluded that McDermott, Mitchell and Sawyer were entitled to directed verdicts, and that Bonney and Sheets were entitled to

judgments notwithstanding the verdict. Further, the jury found that Keith, Neilson and Winkler were not liable. As a result, even if the instruction in regard to damages was insufficient or incorrect, it would be inconsequential.

## IV

Next, the plaintiff claims that, as a result of several improper rulings by the trial court, he is entitled to a new trial on his claims relating to an alleged breach of contract by the Groton board of education. We do not agree.

The plaintiff filed his original complaint on November 24, 1987. Subsequently, he filed three substitute complaints, the last on January 4, 1990. In count twelve of the January 4 complaint, the plaintiff alleged that he had contracted with the Groton board of education, that the terms of that contract were recited in a letter dated April 16, 1987, and that the Groton board of education had breached that contract.[22] In the same count,

[22] In relevant part, that count stated: "4. The parties agreed to the following terms, which were recited in a letter from the Groton Board of Education's attorney, Richard O'Connor to Attorney Ronald Cordelico dated April 16, 1987:

"a) the plaintiff would submit his resignation in writing as a certified professional employee of the Groton Board of Education as of August 31, 1987;

"b) said resignation would be accepted by Richard D. O'Connor, attorney for the defendant;

"c) said resignation would be held in escrow by said attorney until August 31, 1987;

"d) the plaintiff would notify the Superintendent of Schools as soon as practicable of his intention to retire;

"e) the plaintiff would receive, in addition to the benefits described in the contract between the Groton Board of Education and the Groton Education Association the sum of Two Thousand Five Hundred ($2,500.00) Dollars.

"f) the school administration, although required to make a report to the Board of Education in connection with the investigation involving the plaintiff, would continue to investigate the matter with no formal resolution until

the plaintiff further alleged the specific manner in which the contract had been breached.[23] Count sixteen was identical to count twelve except that it alleged that by breaching the contract, the Groton board of education had recklessly caused emotional distress, embarrassment, shame and ridicule to the plaintiff.[24]

On January 4, 1990, the Groton board of education filed a motion in limine requesting "an order barring

the plaintiff's notice of intent to retire. Upon receipt of his notice of intent to retire, the administration would recommend that the investigation cease.

"g) no record of the submission of a petition to the State Board of Education to revoke the plaintiff's teaching certification would be placed in his personnel file.

"h) in the event any person sought references about the plaintiff from the Groton school system, they would be furnished information consistent with annual evaluations by Robert Strouse, the school principal.

"i) the plaintiff would be able to take administrative leave for the remainder of the school year;

"j) the parties, including plaintiff, Board of Education and School Administration would not comment publicly and issue no derogatory statement relative to the plaintiff."

[23] Count twelve also provided: "6. Specifically, the terms not yet complied with by the defendant include the following paragraphs 4e through 4j, to wit:

"4e. No contract benefits have yet been received;

"4f. Members of the Board of Education have continued to press for an investigation of the plaintiff;

"4g. The personnel file is believed to be replete with proscribed materials;

"4h. The United States Department of Defense, a subsequent employer was furnished with highly negative and prejudicial remarks and observations about the plaintiff by the Board of Education members.

"4i. The administration erroneously reported a pejorative version of the plaintiff's placement on administrative leave, leaving the clear but wrong implication that it was involuntary;

"4j. Members of the Board of Education have profusely engaged in public discussions and comment since the formalization of the agreement."

[24] In his complaint filed on January 4, the plaintiff also alleged two additional counts against the Groton board of education. Count seventeen alleged that the board's breach of contract also breached a duty of reasonable care and caused harm to the plaintiff. Count eighteen alleged that the breach of contract by the Groton board of education constituted an invasion of privacy. The jury was not charged on either of those counts, and the plaintiff does not claim error in that regard.

the plaintiff from introducing evidence by testimony or otherwise, of negotiations or agreements outside those set forth in the April 16, 1987 letter which is the subject of plaintiff's complaint." The trial court granted the defendant's motion over the plaintiff's objection. The trial court ruled that the plaintiff was bound by his pleadings and that the plain language of the complaint allowed him to prove only the terms of the agreement that were recited in the letter.

On January 5, 1990, the plaintiff moved to amend his complaint. In that motion he requested that his complaint be amended to state: "The parties agreed to the following terms, which were recited *in part* in [the April 16, 1987 letter] . . . . " The defendants argued that the request to amend should be denied because it was not filed until after ten days of evidence had been presented by the plaintiff; they had done their "trial preparation and prepared [their] cross-examination and prepared [their] witnesses to defend a claim that an agreement was contained in a letter"; the plaintiff had already filed four complaints; and the amendment would violate the parol evidence rule. After argument the trial court reserved decision until some evidence of a contract had entered the case. The plaintiff later testified during an offer of proof proceeding outside the presence of the jury that he had orally discussed additional terms not contained in the letter, and that he later accepted a proposal that contained the terms discussed orally.[25] The trial court denied the motion

[25] The plaintiff testified that, at a meeting between himself, Stipetic and Richard O'Connor, the attorney for the Groton board of education, he discussed specific "proposals" with O'Connor. The plaintiff testified that, in exchange for his resignation, the Board's representatives offered (1) to pay him $2500; (2) not to place any record of the incident in his personnel file; (3) to ensure that any future employment references provided by the school system would be consistent with his favorable record over the past nineteen years and would not include reference to the present allegations; and (4) not to discuss the matter publicly.

stating, "[T]here was no oral agreement and the only agreement is the letter agreement of April 16th." The trial court made no explicit finding on the defendants' assertions that an amendment would cause undue delay and surprise to them.[26]

On February 7, 1990, the plaintiff filed a motion to set aside the verdict, which included the statement that the "Court erred in excluding evidence as to the oral contract between the plaintiff and Defendant." On April 19, 1990, the plaintiff filed a request for leave to amend the motion to set aside the verdict in conjunction with an amended motion to set aside the verdict, which added: "The Court erred in refusing to permit the Plaintiff to amend Counts Twelve and Sixteen Paragraphs 4 to insert the words 'in part' after the word 'recited.' "

### A

The plaintiff first claims that the trial court improperly granted the Groton board of education's motion in limine. We do not agree.

The language of the plaintiff's complaint specifically and unambiguously alleged that there was an agreement between the plaintiff and the defendants, the terms of which "were recited in a letter" from the defendants' attorney to the plaintiff's attorney. The defendants moved to bar the introduction of evidence tending to prove alleged terms of the agreement that were not contained in the letter. The trial court ruled that "[t]he pleadings say . . . that the terms [of the agreement] are set forth in the letter. I think the defense has a right to rely on that. . . ." "The principle that a plaintiff may rely only upon what he has alleged is basic." *Matthews* v. *F.M.C. Corporation,* 190

---

[26] The trial court, however, stated that it agreed with the plaintiff's counsel that the matter of oral discussions had been addressed to a "great extent" in the depositions preceding the trial.

Conn. 700, 705, 462 A.2d 376 (1983). Because the plain language of the plaintiff's complaint limited him to proof of the terms recited within the letter, the trial court properly granted the Groton board of education's motion in limine.

B

The plaintiff next claims that the trial court improperly denied his request to amend the pleadings. He claims that he should have been allowed to amend his complaint to broaden the alleged terms of the agreement between himself and the Groton board of education. We conclude that the trial court did not abuse its discretion in denying the amendment.

"While our courts have been liberal in permitting amendments; *Johnson* v. *Toscano,* 144 Conn. 582, 587, 136 A.2d 341 (1957); this liberality has limitations. Amendments should be made seasonably. Factors to be considered in passing on a motion to amend are the length of delay, fairness to the opposing parties and the negligence, if any, of the party offering the amendment. *Cummings* v. *General Motors Corporation,* 146 Conn. 443, 449–50, 151 A.2d 884 (1959). The motion to amend is addressed to the trial court's discretion which may be exercised to restrain the amendment of pleadings so far as necessary to prevent unreasonable delay of the trial." *Farrell* v. *St. Vincent's Hospital,* 203 Conn. 554, 561–62, 525 A.2d 954 (1987). Whether to grant a request to amend the pleadings is a matter within the discretion of the trial court, and this court will rarely overturn the decision of the trial court. *Bielaska* v. *Waterford,* 196 Conn. 151, 154, 491 A.2d 1071 (1985); *Hanson Development Co.* v. *East Great Plains Shopping Center, Inc.,* 195 Conn. 60, 67, 485 A.2d 1296 (1985). It is the plaintiff's burden in this case to demonstrate that the trial court clearly abused its discretion.

Even if, as the plaintiff alleges, the trial court's articulated ruling was an abuse of discretion, " '[t]his court is authorized to rely upon alternative grounds supported by the record to sustain a judgment.' " *Latimer* v. *Administrator,* 216 Conn. 237, 252, 579 A.2d 497 (1990). "Where the trial court reaches a correct decision but on mistaken grounds, this court has repeatedly sustained the trial court's action if proper grounds exist to support it." *Morris* v. *Costa,* 174 Conn. 592, 597–98, 392 A.2d 468 (1978). In this case the trial court could properly have denied the plaintiff's motion to amend because an amendment at that stage of the proceedings would have unduly surprised the defendants or delayed the trial, or because the plaintiff was negligent in failing to frame his complaint adequately, he having previously filed substitutions three times. To the extent that there was any lack of clarity as to whether the trial court considered those factors, it was the plaintiff's duty to request that the court articulate its ruling. Practice Book § 4051;[27] *Barnes* v. *Barnes,* 190 Conn. 491, 493–94, 460 A.2d 1302 (1983). The following circumstances would easily have supported the trial court's decision to deny the motion to amend. The plaintiff had filed a total of four complaints prior to his request to amend. He filed the latest request to amend ten days subsequent to the commencement of testi-

[27] Practice Book § 4051 provides in relevant part: "A motion for rectification or articulation shall be filed in triplicate with the chief clerk of the supreme court and forwarded by such clerk to the trial judge. The trial judge shall file the ruling on the motion with the chief clerk of the supreme court.

"Any motion seeking corrections in the transcript or the trial court record which depend on proof of matters not of record or seeking an articulation or further articulation of the decision of the trial court shall be determined by the judge of the trial court whence the appeal is taken or the reservation is made. The trial court may make such corrections or additions as are necessary for the proper presentation of the preliminary statement of issues or for the proper presentation of questions reserved; or the trial court may approve a stipulation of counsel that such a correction or addition may be reviewed by the supreme court under Sec. 4054."

mony. The defendants asserted that they had prepared their case in reliance on the language of the complaint.[28] Accordingly, we conclude that the trial court did not abuse its discretion when it denied the plaintiff's motion to amend his complaint.

## C

The plaintiff also claims that the trial court's instructions to the jury improperly limited his potential damages to $2500 for the breach of contract by the Groton board of education plus damages for emotional distress caused by the board's failure to pay the $2500. The plaintiff argues that the jury also should have been allowed to assess additional damages because the Groton board of education further breached its contract when a member of the board failed to recommend to the board that the investigation of the plaintiff be discontinued. We do not agree.

In his complaint, the plaintiff alleged that he and the board had agreed that "[u]pon receipt of his notice of intent to retire, the administration would recommend that the investigation cease." The complaint also alleged six distinct ways in which the agreement between the board and the plaintiff had been breached. See part I, supra. The complaint did not allege that

[28] The plaintiff also appears to argue that the amendment of the complaint should have been allowed because the evidence of terms not contained in the letter would not have constituted a variance from the pleadings, and if it did constitute a variance, it would have been an immaterial variance. This argument is misplaced. The doctrine of variance is applicable only when evidence actually enters the case and varies from the pleadings. *Strimiska* v. *Yates,* 158 Conn. 179, 185, 257 A.2d 814 (1969). The introduction of any such evidence was explicitly barred by the trial court's granting of the defendant's motion in limine. Plainly, there was no variance between the evidence and the pleadings in this case. Whether the evidence would have constituted a variance if it were admitted is irrelevant to whether, prior to the introduction of any evidence related to the contract claims, the plaintiff should have been allowed to amend his complaint.

one of the ways in which the contract had been breached was by the administration's failure to make the recommendation.[29] Further, there is no indication that the plaintiff made any attempt to amend the pleadings to reflect that allegation. The trial court instructed the jury that they could find only the $2500 as damages plus emotional damages.[30] The court did not instruct the jury about the possibility of damages for failure to make the recommendation to cease the investigation of the plaintiff.

"The purpose of the complaint is to limit the issues to be decided at the trial of a case and is calculated to prevent surprise." *Farrell* v. *St. Vincent's Hospital,* 203 Conn. 554, 557, 525 A.2d 954 (1987). "It is generally true . . . that the allegations of the complaint provide the measure of recovery, and that the judgment cannot exceed the claims pleaded . . . ." *Todd* v. *Glines,* 217 Conn. 1, 9, 583 A.2d 1287 (1991). Because the plaintiff did not allege that the contract had been breached by the board's failure to recommend that the investigation of him cease, he was not entitled to have the jury instructed that it could make such a finding. Therefore, the trial court properly refused to charge as the plaintiff requested.[31]

---

[29] In fact, in the only testimony offered at trial on this topic, Stipetic testified that she had made the recommendation to the board.

[30] Prior to jury deliberations, the board moved for a directed verdict on all counts and the trial court granted it except for the $2500 and the emotional distress. The plaintiff makes no claim that the motion for directed verdict should not have been granted.

[31] We have painstakingly reviewed the plaintiff's remaining claims. Several are so poorly drafted and so intolerably confusing that they make a mockery of responsible appellate advocacy and preclude meaningful appellate review. *Commissioner* v. *Youth Challenge of Greater Hartford, Inc.,* 206 Conn. 316, 317–18, 537 A.2d 480 (1988). The remaining issues are either "inadequately briefed, duplicative or [lack] merit." *Kilduff* v. *Adams, Inc.,* 219 Conn. 314, 338, 593 A.2d 478 (1991).

The judgment is reversed in part and the case is remanded to the trial court with direction to render judgment in favor of Bonney and Sheets.

In this opinion the other justices concurred.