SUSAN MORGAN *v.* RUTHE BUBAR ET AL.
(AC 28151)

Harper, Beach and McDonald, Js.

Argued January 8, 2008—officially released July 14, 2009

*Nancy A. Brouillet,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Margaret Q. Chapple,* assistant attorney general, for the appellants (defendants).

*Andrew R. Cellemme,* for the appellee (plaintiff).

*Opinion*

BEACH, J. At times, principles conflict. Here, the questions presented are whether a right to pursue a defamation action is subordinate to the right to complain through appropriate administrative channels and whether state employees may be sued for damages for failing to investigate such complaints. The defendants, Ruthe Bubar, Robert Carini and Lora A. Castronova, appeal from the trial court's denial of their motion for summary judgment. The defendants claim that the court improperly denied their motion for summary judgment, which claimed (1) that Bubar was entitled to absolute immunity and (2) that Carini and Castronova were entitled to qualified immunity. We agree and reverse the judgment of the trial court.

The following facts were presented to the court by way of the pleadings and documents accompanying the motion for summary judgment. They are not in dispute for the purpose of our resolution of the defendants' appeal. At relevant times, the plaintiff, Susan Morgan, and the defendants were employees of the department of correction and were assigned to the York Correctional Institution in Niantic. The plaintiff instituted this action against the defendants by way of a four count

complaint. Counts one and two of the amended complaint alleged claims sounding in defamation against Bubar. Both of the allegedly defamatory statements in this case involve accusations by Bubar that the plaintiff choked her at some point in early 1999. Count one alleged defamation arising out of statements by Bubar during a meeting on August 10, 2000, attended by an affirmative action officer, the plaintiff and several coworkers. Count two alleged defamation arising out of a memorandum dated August 8, 2000, written by Bubar to Castronova, in which Bubar reiterated an earlier statement that she had made to Castronova regarding the alleged choking incident.

Counts three and four of the amended complaint alleged deprivations of the plaintiff's rights to due process and equal protection under the fourteenth amendment to the United States constitution and were brought pursuant to 42 U.S.C. § 1983. They were brought against Carini and Castronova, respectively. These two counts alleged that Carini's and Castronova's failure to investigate Bubar's choking allegations, as required by a state executive order on workplace violence and various department of correction directives, deprived the plaintiff of her due process and equal protection rights because an investigation would have refuted the allegations and "cleared the plaintiff's name . . . ." Counts three and four also alleged that the failure to investigate resulted in employment actions that were adverse to the plaintiff.

The defendants moved for summary judgment on the grounds that, inter alia, Bubar's allegedly defamatory statements are entitled to absolute immunity because they were made in the course of an administrative affirmative action complaint and that Carini and Castronova are entitled to qualified immunity as public officials because they allegedly violated no clearly defined constitutionally protected rights of the plaintiff. The court

denied the defendants' motion, and the defendants moved for an articulation of the court's ruling. In its articulation, the court rejected the defendants' absolute immunity argument on the ground that "[t]he evidence submitted by the defendants . . . does not meet their burden of showing that there is no genuine issue of material fact as to whether the August 10, 2000 meeting was part of an affirmative action investigation or complaint." The court also rejected the defendants' qualified immunity argument on the ground that "genuine issues of material fact exist as to the reasonableness of [Castronova's and Carini's] conduct." Additional facts will be set forth as necessary.

We begin by setting forth the applicable standard of review.[1] "Summary judgment shall be rendered forthwith if the pleadings, affidavits and other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. . . . When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Schilberg Integrated Metals Corp.* v. *Continental Casualty Co.*, 263 Conn. 245, 251–52, 819 A.2d 773 (2003).

The determination of whether an affirmative action investigation constitutes a quasi-judicial proceeding is a question of law over which our review is plenary. Whether particular conduct is by its nature part of or in furtherance of a quasi-judicial proceeding for the purposes of triggering absolute immunity, however, depends on the particular facts and circumstances of

[1] The standard of review applies to parts II and III.

each case. See *Craig* v. *Stafford Construction, Inc.*, 271 Conn. 78, 83–84, 856 A.2d 372 (2004). "Whether an official is entitled to qualified immunity presents a question of law that must be resolved de novo on appeal." *Fleming* v. *Bridgeport*, 284 Conn. 502, 518, 935 A.2d 126 (2007).

I

As a preliminary matter, we must address the issue of whether the denial of the defendants' motion for summary judgment is a final judgment from which they immediately may appeal.[2] We conclude that the court's rulings on the portions of the defendants' appeal that pertain to their claims of absolute immunity and qualified immunity may be addressed by this court.[3] "As a general rule, an interlocutory ruling may not be appealed pending the final disposition of a case." *Chadha* v. *Charlotte Hungerford Hospital*, 272 Conn. 776, 784, 865 A.2d 1163 (2005). A denial of a motion for summary judgment, however, "which had been filed on the basis of a colorable claim of absolute immunity, constitutes an appealable final judgment." Id., 787. Like sovereign immunity, the doctrine of absolute immunity "protects against suit as well as liability—in effect, against having to litigate at all." Id., 786. In the present case, the defendants' claim of absolute immunity is at

[2] On December 18, 2008, we notified the parties via letter to be prepared to address at oral argument "any questions that the court may have as to whether the portions of the defendants' appeal that do not pertain to the doctrine of absolute immunity should be dismissed for lack of a final judgment."

[3] The defendants also claim that the plaintiff's § 1983 claims were not viable because the plaintiff's equal protection and due process rights were not violated. We do not consider these claims on appeal. See *Cox* v. *Aiken*, 86 Conn. App. 587, 591 n.4, 595 n.7, 595 n.8, 862 A.2d 319 (2004) (defendants' claim regarding exhaustion of contractual remedies could not be reviewed in appeal from denial of motion to dismiss because, unlike their colorable claims of sovereign immunity, their exhaustion claim did not constitute appealable interlocutory ruling), rev'd on other grounds, 278 Conn. 204, 897 A.2d 71 (2006).

least colorable because, most apparently, our case law consistently has recognized such immunity in similar factual settings. See, e.g., *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. 88–96; *Kelley* v. *Bonney*, 221 Conn. 549, 606 A.2d 693 (1992); *Petyan* v. *Ellis*, 200 Conn. 243, 510 A.2d 1337 (1986). The defendants' claim that Bubar is entitled to absolute immunity is properly before this court.

We next address whether the court's ruling with respect to the defendants' qualified immunity claims constitutes a reviewable final judgment. In counts three and four of the amended complaint, the plaintiff alleged that Carini and Castronova violated her constitutional rights and thereby violated 42 U.S.C. § 1983. Although state courts have concurrent jurisdiction over claims brought under § 1983, state courts must apply federal law in determining whether a defendant is immune from prosecution. See *Martinez* v. *California*, 444 U.S. 277, 284 n.8, 100 S. Ct. 553, 62 L. Ed. 2d 481 (1980); *Sullins* v. *Rodriguez*, 281 Conn. 128, 136, 913 A.2d 415 (2007); *Schnabel* v. *Tyler*, 230 Conn. 735, 742–43, 646 A.2d 152 (1994) ("[A] claim for qualified immunity from liability for damages under § 1983 raises a question of federal law . . . and not state law. Therefore, in reviewing these claims of qualified immunity we are bound by federal precedent, and may not expand or contract the contours of the immunity available to government officials." [Citations omitted; internal quotation marks omitted.]). In considering whether a District Court's denial of a claim of qualified immunity was an appealable final decision under federal law, the United States Supreme Court directly addressed the question of whether a finding of qualified immunity in the context of a § 1983 action compels immunity from suit as well as from liability. In *Mitchell* v. *Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985), the court stated that "[t]he entitlement is an immunity from suit

rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." In this state, consistent with federal law, an otherwise interlocutory judgment may immediately be appealable "where the order or action so concludes the rights of the parties that further proceedings cannot affect them." *State* v. *Curcio*, 191 Conn. 27, 31, 463 A.2d 566 (1983). The defendants' claim that the court improperly denied the motion for summary judgment as to whether Carini and Castronova are entitled to qualified immunity is properly before this court.

## II

We turn now to Bubar's absolute immunity claim. The dispositive issues are whether the setting in which her statements were made was a quasi-judicial proceeding and, if so, whether the alleged defamatory statements were made in the course of the proceeding and related to the subject matter of that proceeding. Count one concerns allegedly defamatory statements made by Bubar in a meeting on August 10, 2000. Count two concerns statements made by Bubar in a memorandum to Castronova that was dated August 8, 2000. The memorandum requested an affirmative action proceeding, and the August 10 meeting was, according to Bubar, part of the affirmative action process. Bubar argues that the court improperly denied summary judgment as to these counts because Bubar's statements at issue were made during the course of a quasi-judicial proceeding, thereby entitling them to absolute immunity. The plaintiff argues that there is a genuine issue of material fact as to whether there was a quasi-judicial proceeding. We agree with Bubar and conclude that her statements are entitled to absolute immunity.

The following additional facts are necessary for our resolution of the defendants' claim and are not in dispute. At some point in early 1999, Bubar reported to

Carini, the supervisor of both the plaintiff and Bubar, that approximately one week earlier the plaintiff had approached Bubar in the workplace, grabbed her by her lapels, shook her and said something to the effect of, "[s]ometimes I get so frustrated with you." On August 8, 2000, Bubar wrote the memorandum to Castronova, the supervisor of the plaintiff, Bubar and Carini. Bubar wrote in this memorandum that she meant to "reiterate and clarify" the concerns she stated in a meeting she had with Castronova and Carini on August 4, 2000. Bubar made the following statement in the memorandum: "[The plaintiff's] anger and her unprofessional behavior directed towards me continues in an unresolved pattern. . . . I find [the plaintiff's] more recent verbal accusations and written documentation extremely threatening to me, especially due to the fact that [her] past history of anger resulted in her physically assaulting me in the work place. Based on these factors, I am acutely aware that [the plaintiff] has demonstrated a true capacity to harm, not only my professional character and reputation, but also, [she] presents a very real threat of physical danger to me. I still do not feel safe." Bubar concluded the memorandum with the following: "I am requesting York Correction Institution's administration to refer this matter to Affirmative Action for resolution." This statement, which the plaintiff alleges to be defamatory in nature, forms the basis for count two.

On August 10, 2000, a meeting was held among the plaintiff, Bubar and Charlene Burton, an affirmative action officer with the department of correction. Also present were Nancy Chartier, a coworker at York, and Charles Ward, a union representative. The plaintiff alleged in count one that Bubar made the following defamatory statement at the meeting: " '[The plaintiff] put her hands on my neck and choked me so hard I could not feel my feet.' " This meeting was described

as an "affirmative action meeting" by the plaintiff, Bubar and Ward in separate department incident reports filed in early 2001. In another incident report completed by Chartier, she stated that the purpose of the meeting was to attempt to resolve "an issue between staff . . . ." The statement made in this meeting forms the basis for count one.

A second meeting was held the following month. Present at this meeting were the plaintiff, Bubar, Burton, Ward and Carini. In his incident report, Ward stated that this meeting "was in regards to Bubar's accusation that [the plaintiff] allegedly choked her." In an incident report prepared by Bubar, she stated that at that second meeting, "Burton stated that since there was no initial incident report written regarding this matter . . . she would not formally pursue any part of it, equating it to a 'moot point'." Also, according to Bubar's account of the second meeting, "Burton stated that nothing further would ever be done with this incident: there would be no report, nothing written, or nothing placed into our [department of correction] personnel files regarding this matter." In her incident report, the plaintiff claims that Burton contacted her on November 9, 2000, and informed her that "an investigation was never conducted because the choking incident was not an affirmative [action] matter."

The defendants moved for summary judgment as to counts one and two on the ground that Bubar was entitled to absolute immunity because the statements were made during the course of an affirmative action investigation. Because of Burton's statements that the incident was "not an affirmative [action] matter" and that she would not formally pursue it, the court concluded that a genuine issue existed as to whether an affirmative action investigation had ever been instituted. The court denied the defendants' motion, and they appealed.

"A defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him . . . . To establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." (Citations omitted; internal quotation marks omitted.) *Cweklinsky* v. *Mobil Chemical Co.*, 267 Conn. 210, 217, 837 A.2d 759 (2004).

"The effect of an absolute privilege in a defamation action [however] is that damages cannot be recovered for a defamatory statement even if it is published falsely and maliciously. . . . [L]ike the privilege which is generally applied to pertinent statements made in formal judicial proceedings, an absolute privilege also attaches to relevant statements made during administrative proceedings which are quasijudicial in nature. . . . Once it is determined that a proceeding is quasijudicial in nature, the absolute privilege that is granted to statements made in furtherance of it extends to every step of the proceeding until final disposition." (Citations omitted; internal quotation marks omitted.) *Kelley* v. *Bonney*, supra, 221 Conn. 565–66.

"The judicial proceeding to which [absolute] immunity attaches has not been defined very exactly. It includes any hearing before a tribunal which performs a judicial function, ex parte or otherwise, and whether the hearing is public or not. It includes, for example, lunacy, bankruptcy, or naturalization proceedings, and an election contest. It extends also to the proceedings of many administrative officers, such as boards and commissions, so far as they have powers of discretion in applying the law to the facts which are regarded as

judicial or quasi-judicial, in character." *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. 84–85. In *Kelley*, our Supreme Court delineated several factors that assist in determining whether a proceeding is quasi-judicial in nature. These factors include "whether the body has the power to: (1) exercise judgment and discretion; (2) hear and determine or to ascertain facts and decide; (3) make binding orders and judgments; (4) affect the personal or property rights of private persons; (5) examine witnesses and hear the litigation of the issues on a hearing; and (6) enforce decisions or impose penalties." *Kelley* v. *Bonney*, supra, 221 Conn. 567. "Further, it is important to consider whether there is a sound public policy reason for permitting the complete freedom of expression that a grant of absolute immunity provides." Id.

In *Kelley*, our Supreme Court held that statements made by persons requesting the state board of education to investigate a local teacher were absolutely privileged. Id., 571. Similar to the memorandum at issue in the present case, the source of the allegedly defamatory statements in *Kelley* was a letter written by members of a local school board requesting an investigation into acts of alleged wrongdoing by a teacher in the local board's district. Id., 554–55. In reaching its conclusion that the statements in the letter were absolutely privileged, the court considered the factors enumerated previously and concluded that the state board of education was a quasi-judicial body. Id., 571. The court noted the state board's ability to revoke a teaching certificate and the requirement that a request for revocation be submitted under oath. Id., 567–69. The state board was required to conduct a preliminary inquiry to determine whether probable cause existed. Id., 569. If it were to find that probable cause existed, the holder of the certificate would be notified, and a public hearing would be held at the request of the holder. Id., 569–70.

At the hearing, the holder was entitled to counsel, to be heard, to call and to cross-examine witnesses and to present oral argument. Id., 570. Finally, the state board was required to state in writing the reasons for its decision. Id. The court concluded that "[t]he detailed procedures . . . and the compelling public policy concern for the protection of school age children persuade us that the decertification proceedings before the state board of education were quasijudicial in nature, and that any steps made as a requisite step in those proceedings were absolutely privileged." Id., 571.

In *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. 88, our Supreme Court applied the factors articulated in *Kelley* and concluded that an investigation conducted by the internal affairs division of the Hartford police department was a quasi-judicial proceeding. The allegedly defamatory statement in *Craig* was a citizen complaint to the department. Id., 81. It accused an officer of using a racial slur while on the job. Id. In support of its conclusion that the investigation by the department constituted a quasi-judicial proceeding, the court noted that the internal affairs investigation process required complaints to be put into written form and to be sent to the internal affairs division where a determination would be made as to whether the charges would be investigated by the officer's immediate supervisor or an internal affairs investigator. Id., 87. If, as in *Craig*, an internal affairs investigator is assigned, the investigator acts as a fact finder by interviewing witnesses, who give sworn statements under penalty of criminal liability. Id. The investigator then prepares a report that is presented to the commander of the internal affairs division, who reviews the report and then forwards it to a bureau commander. Id. The bureau commander then reviews the report and determines whether the department should further investigate the claims. Id. If the department determines there should be further

investigation, the chief of police may pursue one of several options, including ordering command discipline, issuing an oral reprimand, issuing a written reprimand, ordering an expedited hearing or ordering a formal hearing. Id. At a formal hearing, the accused has the right to counsel, witnesses testify under oath, the accused has the right to cross-examine, and a city attorney is present to rule on questions of evidence. Id., 88. The formal hearing carries a potential penalty of suspension or termination, and the officer has the right to appeal from the decision. Id., 87–88. After outlining this process, the court determined that the internal affairs procedure met most of the six factors articulated in *Kelley* and determined that it was a quasi-judicial proceeding. Id., 88–90. On the basis of this determination, the court concluded that the statements made during the course of the internal affairs investigation were entitled to the protection of absolute immunity. Id., 93. Similar to the present case, the allegedly defamatory statements in *Craig* were made during the preliminary stages of the investigation, before any formal action was taken. Id., 81. These statements were entitled to absolute immunity because immunity "extends to every step of the [proceeding] until final disposition." (Internal quotation marks omitted.) Id., 93, quoting *Kelley* v. *Bonney*, supra, 221 Conn. 566.

In the context of the present case, the department of correction's affirmative action investigation procedure is governed by the department's administrative directive 2.1 entitled "Equal Employment Opportunity and Affirmative Action." Paragraph ten of the directive, entitled "Grievance Procedure," outlines the steps to be taken to resolve a grievance brought to the affirmative action unit. It requires a grievance to be filed with the affirmative action unit within sixty days of the alleged discriminatory act. The affirmative action unit is directed first to attempt to resolve the grievance

"through an informal process" to "reconcile the matter at the lowest possible level." The affirmative action unit first conducts an investigation to determine whether an employment discrimination violation may have occurred. If it concludes that the grievance is not valid or that no discriminatory act occurred, the grievance may be dismissed. This decision is appealable to the commissioner of correction. If, however, it concludes that a violation may have occurred, it is directed to "initiate attempts to cause reconciliation of the parties." If the parties to the grievance agree to a resolution, the terms of the resolution are set forth in a written agreement that is signed by both parties. The commissioner of correction has the power to enforce the terms of the resolution agreement. The grievance procedure also permits the filing of complaints with the commission on human rights and opportunities or the federal Equal Employment Opportunity Commission but requires that the informal grievance process, once initiated, be exhausted before these alternate routes are pursued.

With this background in mind, we conclude that the department of correction's affirmative action investigation process constitutes a quasi-judicial proceeding and, accordingly, statements made within the context of that investigation are appropriately afforded absolute privilege. We consider the factors articulated in *Kelley* v. *Bonney*, supra, 221 Conn. 567. With regard to the first factor, affirmative action unit officers exercise judgment and discretion during the informal investigation process when they determine whether a grievance is valid and whether a discriminatory act has occurred. If they determine that the grievance is not valid or no discriminatory act has occurred, the grievance may be dismissed, subject to review by the commissioner of correction. If they determine that the grievance is valid and a discriminatory act has occurred, they initiate

attempts to reach a reconciliation agreement between the parties. The act of attempting to reconcile the grievance between the parties is analogous to the procedures of other bodies that we have concluded are quasi-judicial in nature. See *Preston* v. *O'Rourke*, 74 Conn. App. 301, 312, 811 A.2d 753 (2002) (concluding that arbitration process was quasi-judicial proceeding).

As to the second factor, affirmative action officers hear and ascertain facts during the informal investigation. Officers must decide, on the basis of the facts gathered during the informal investigation phase of the procedure, whether a discriminatory act has occurred and whether to proceed with attempts to reconcile the grievance between the parties. The directive's requirement that officers "attempt to reconcile the matter at the lowest possible level" necessarily requires that they hear and determine facts.

The third factor is whether the body has the power to make binding orders and judgments. Apparently, such power is indirect, though not entirely lacking: the agreements reached are enforceable in that the commissioner of correction is empowered to make binding orders of compliance if a party fails to meet the obligations set forth in the resolution agreement between the parties.

As to the fourth factor, the investigation may have some effect on personal or property rights: Administrative directive 2.6,[4] entitled "Employee Discipline," grants the commissioner of correction responsibility "for approving all dismissals, demotions or suspensions . . . ." Disciplinary action may result from the violation of agreements, and the affirmative action process must be exhausted before other administrative remedies may

[4] This administrative directive explicitly incorporates under "Authority and Reference" administrative directive 2.1, which outlines the affirmative action unit grievance procedure.

be pursued. See *Craig* v. *Stafford Construction, Inc.*, *supra*, 271 Conn. 90 (potential suspension or dismissal of officer being investigated affects personal or property rights).

With regard to the fifth factor, examining witnesses and hearing litigation, the administrative directive governing the affirmative action unit states that its responsibilities include conducting and overseeing "the investigation and resolution of discrimination complaints . . . made under the Department's Affirmative Action Grievance Procedure." Questioning witnesses and hearing the issues, though quite informally, fall under the affirmative action officers' responsibility to investigate grievances and resolve them "at the lowest possible level." Furthermore, paragraph twelve of administrative directive 2.1 prohibits adverse action against an individual for "filing a complaint, testifying, assisting or participating in any manner in an investigation proceeding or hearing." This section signals that the grievance procedure contemplates the calling of witnesses and hearing of testimony as part of the affirmative action investigation process.

Finally, the sixth factor addresses the body's ability to enforce decisions or to impose penalties. The commissioner of correction has the power to enforce the terms of any resolution agreement, and the administrative directive on employee discipline permits the commissioner to impose penalties for failure to follow orders.

The contemplated procedures are informal and allow for a degree of flexibility in resolving workplace conflict. Some of the *Kelley* factors are more clearly satisfied than others. See *Craig* v. *Stafford Construction, Inc.*, *supra*, 271 Conn. 94–95 (quasi-judicial body need not possess all six powers). On balance, however, we

believe that the process has sufficient indicia of regularity to qualify as a quasi-judicial proceeding.

Additionally, there are strong public policy justifications for affording absolute immunity. "The policy underlying the privilege is that in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements." (Internal quotation marks omitted.) *Petyan* v. *Ellis*, supra, 200 Conn. 246. It "reflects the unspoken reality that, if there were no absolute immunity, good faith criticism of governmental misconduct might be deterred by concerns about unwarranted litigation." (Internal quotation marks omitted.) *Craig* v. *Stafford Construction, Inc.*, supra, 271 Conn. 95. In *Craig*, our Supreme Court recognized the "debilitating" effect that a false allegation of racial discrimination can have on a police officer but concluded that the policy of encouraging citizen complaints outweighed the need to protect the reputation of the officer against whom a complaint is made. Id., 95–96. The same reasoning applies in the present case. A false allegation of discrimination to the affirmative action unit at the department of correction may have a debilitating effect on the employee against whom the complaint is made. We conclude, however, that the policy of encouraging candid disclosure of discriminatory occurrences outweighs the risk that statements made in the context of an affirmative action investigation may be false or malicious.[5]

Having concluded that the department of correction's affirmative action investigation constitutes a quasi-judicial proceeding, we must next determine whether the alleged defamatory statements were made in the course

[5] Paragraph twelve of administrative directive 2.1 itself prohibits adverse action for "filing a complaint, testifying, assisting or participating in any manner in an investigation proceeding or hearing."

of the proceeding and whether they related to the subject matter of that proceeding. See *Kelley* v. *Bonney*, supra, 221 Conn. 566 (absolute privilege attaches to relevant statements made in furtherance of quasi-judicial proceeding). Because the alleged defamatory statements clearly related to the subject matter of the proceeding, that being the alleged choking incident, we must determine only whether the statements at issue were made in the course of the proceeding. "Once it is determined that a proceeding is quasijudicial in nature, the absolute privilege that is granted to statements made in furtherance of it extends to *every step of the proceeding* until final disposition." (Emphasis added; internal quotation marks omitted.) Id. "[A]llegations contained within a complaint in a quasijudicial proceeding are absolutely privileged." Id., 571.

Bubar's two statements at issue were made in an effort to initiate an affirmative action investigation. The memorandum containing the statement forming the basis of count two of the plaintiff's amended complaint concluded with a specific request that the matter be referred to the affirmative action unit. The memorandum is functionally identical to the request for the investigation in *Kelley*. See id., 554–55. The statement at issue in the first count was made during a meeting with the affirmative action officer in response to Bubar's earlier request that the matter be referred to the affirmative action unit. Like the statements at issue in *Craig*, which were made in the preliminary stage of responding to a citizen complaint, the allegedly defamatory statements in the present case were made during the initial fact gathering phase of the proceeding.

The plaintiff, however, argues that the statements were not made in the context of an affirmative action investigation because affirmative action officer Burton concluded that the alleged choking incident was "not an affirmative [action] matter." The plaintiff argues that

"[b]ecause [Burton] concluded that the matter was not in her jurisdiction, she never attempted to resolve the matter at all."

Contrary to the plaintiff's assertions, the fact that Burton decided against taking further action does not mean that Bubar's statements were not made in the context of a quasi-judicial proceeding. If, for example, a plaintiff filed a complaint in the Superior Court that was later dismissed for lack of jurisdiction, the plaintiff would still be entitled to absolute immunity against defamation claims arising from statements made in that complaint despite the fact that the action was dismissed. See *DeLaurentis* v. *New Haven*, 220 Conn. 225, 263, 597 A.2d 807 (1991) ("[t]he common law protects allegations in a complaint with an 'absolute privilege' "). In *Hopkins* v. *O'Connor*, 282 Conn. 821, 925 A.2d 1030 (2007), our Supreme Court faced the issue of whether a police officer's actions pursuant to General Statutes § 17a-503 (a), which permits an officer to "execute a written request for [an] emergency examination" of an individual "in need of immediate care and treatment," were sufficiently connected to a commitment proceeding to warrant absolute immunity. *Hopkins* v. *O'Connor*, supra, 837; General Statutes § 17a-503 (a). In its analysis of this issue, the court stated: "It would, in our view, make no sense to make the police officer's immunity dependent on the outcome of that evaluation and whether the psychiatrist determines that commitment is appropriate." *Hopkins* v. *O'Connor*, supra, 837. Similarly, in *Kelley*, the court concluded that a request for an investigation to be held was entitled to absolute privilege regardless of the ultimate outcome of that investigation. *Kelley* v. *Bonney*, supra, 221 Conn. 571. By analogy, it would make no sense in the present case to make a complainant's immunity dependent on the affirmative action officer's conclusion.[6] Furthermore, it

---

[6] The plaintiff does not include in her brief to this court any articulated claim that workplace violence has nothing to do with affirmative action

should be noted that at least two meetings were held between the plaintiff, Bubar, the affirmative action officer and others before the affirmative action unit's involvement in the matter was terminated. We conclude that Bubar's statements were made in the course of the proceeding and are therefore entitled to absolute immunity.

## III

The defendants next claim that the court improperly denied their motion for summary judgment as to counts three and four of the amended complaint. The defendants argue that Carini and Castronova are entitled to qualified immunity because they did not violate a clearly established constitutional right. The plaintiff argues that the court correctly denied summary judgment as to counts three and four because there was at least a genuine issue of fact as to whether Carini and Castronova violated her constitutional rights to due process and equal protection under the fourteenth amendment to the United States constitution. We agree with the defendants.

In counts three and four of her amended complaint, the plaintiff alleged that Carini and Castronova were required to initiate and to conduct an investigation into Bubar's allegation of "workplace violence" as required by Executive Order No. 16, "Violence in the Workplace

beyond quoting, for the purpose of showing that an affirmative action investigation never occurred, Burton's statement that the allegations were "not an affirmative [action] matter." It is unclear from the record exactly why Bubar requested that the affirmative action unit become involved in an accusation of workplace violence. From the plaintiff's testimony during a deposition, it appears that the plaintiff and Bubar were under the impression that Bubar's accusations against the plaintiff would fall within the scope of a "hostile work environment" claim to the affirmative action unit. Because this issue was not clearly raised, it does not affect our analysis. See Hare v. McClellan, 234 Conn. 581, 588 n.5, 662 A.2d 1242 (1995).

Prevention Policy" (August 4, 1999) (executive order).[7] In count three, the plaintiff specifically alleged that Carini's "failure, refusal and neglect to investigate and act upon the reported assault was an abuse of his authority, and constituted a deliberate indifference to the plaintiff's rights to equal protection and due process guaranteed to her by the [fourteenth] [a]mendment to the United States [c]onstitution and protected by 42 U.S.C. § 1983." In count four, the plaintiff alleged that Castronova's "failure to investigate constituted a deliberate indifference and/or denial of the plaintiff's rights to equal protection and due process of law guaranteed to her by the [fourteenth] [a]mendment to the United States [c]onstitution and protected by 42 U.S.C. § 1983."

The defendants sought summary judgment as to counts three and four on the ground that Carini and

[7] The executive order provides in pertinent part: "I, John G. Rowland, [g]overnor of the [s]tate of Connecticut, acting by virtue of the authority vested in me by the [c]onstitution and by the statutes of this state, do hereby ORDER and DIRECT:

"1. That all state agency personnel, contractors, subcontractors, and vendors comply with the following *Violence in the Workplace Prevention Policy*:

"The [s]tate of Connecticut adopts a statewide zero tolerance policy for workplace violence.

"Therefore, except as may be required as a condition of employment . . . [n]o employee shall cause or threaten to cause death or physical injury to any individual in a state worksite. . . .

"3. That all managers and supervisors are expected to enforce this policy fairly and uniformly.

"4. That any employee who feels subjected to or witnesses violent, threatening, harassing, or intimidating behavior in the workplace immediately report the incident or statement to their supervisor, manager, or human resources office.

"5. That any employee who believes that there is a serious threat to their safety or the safety of others that requires immediate attention notify proper law enforcement authorities and his or her manager or supervisor.

"6. That any manager or supervisor receiving such a report shall immediately contact their human resources office to evaluate, investigate and take appropriate action. . . .

"9. That this order applies to all state employees in the executive branch.

"10. That each agency will monitor the effective implementation of this policy.

"11. That this order shall take effect immediately." (Emphasis in original.)

Castronova were entitled to qualified immunity. In its denial of the defendants' motion, the court rejected the defendants' qualified immunity argument. In its articulation, the court concluded that "there is clearly an established right at stake" and stated that "there are genuine issues of material fact as to the objective reasonableness of [Carini's and Castronova's] conduct in not immediately instituting an investigation after receiving allegations of a physical assault . . . ."

"[A] claim for qualified immunity from liability for damages under § 1983 raises a question of federal law . . . and not state law. Therefore, in reviewing these claims of qualified immunity we are bound by federal precedent, and may not expand or contract the contours of the immunity available to government officials. . . . Furthermore, in applying federal law in those instances where the United States Supreme Court has not spoken, we generally give special consideration to decisions of the Second Circuit Court of Appeals." (Citations omitted; internal quotation marks omitted.) *Schnabel* v. *Tyler*, supra, 230 Conn. 742–43. "Qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (Internal quotation marks omitted.) *Tuchman* v. *State*, 89 Conn. App. 745, 762, 878 A.2d 384, cert. denied, 275 Conn. 920, 883 A.2d 1252 (2005).

"When [a motion for summary judgment] is based on assertion of qualified immunity, the first issue is whether a clearly established right is at stake. . . . If it is, the court must then address whether the conduct was objectively reasonable. If not, the motion must be denied." (Citation omitted.) *Blue* v. *Koren*, 72 F.3d 1075, 1084 (2d Cir. 1995), citing *Siegert* v. *Gilley*, 500 U.S. 226, 232, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991). "A necessary concomitant to the determination of whether

the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert* v. *Gilley*, supra, 232. Recently, the United States Supreme Court held that courts considering a claim of qualified immunity may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson* v. *Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). Thus, we may first decide whether the facts alleged state a violation of a constitutional right or whether the right at issue was "clearly established" at the time of the defendants' alleged misconduct. See id.

We begin our analysis with the issue of whether the facts alleged in the amended complaint state a violation of a constitutional right. The plaintiff's allegations against Carini in count three and Castronova in count four are very similar and are, for the purposes of the following analysis, functionally identical. In count three, the plaintiff alleged that Carini received notice of Bubar's alleged defamatory statement made during the August 10, 2000 meeting on that same date. In count four, the plaintiff alleged that Bubar prepared and delivered the August 8, 2000 memorandum that contained the defamatory statements to Castronova on that date. The plaintiff alleged that Bubar's accusations against her in the meeting and the memorandum constituted reports of violence in the workplace, and, therefore, Carini and Castronova were required by the executive order to "initiate and conduct an investigation into the reported violence pursuant to" administrative directives, department of correction policies and the executive order.

In count three, the plaintiff further alleged that Carini's failure to conduct the investigation, "which would have refuted . . . Bubar's allegations and cleared the plaintiff's name," left the "allegations unrefuted, created a false appearance that the plaintiff was guilty of . . . Bubar's allegations against her [and] resulted in employment actions that were adverse to the plaintiff," including, inter alia, being reassigned to lesser positions, being denied opportunities for training, promotion and transfer, receiving lower employee evaluation marks and being assigned to "environments which were known to contain hazards and which were harmful to her . . . ." In count four, the plaintiff alleged that "[o]n or about January 9, 2001, in an effort to clear her name and prevent further adverse employment actions against her, the plaintiff . . . submitted a written incident report to . . . Castronova and requested that an investigation be initiated and conducted into the false allegations which had been brought against her by . . . Bubar on August 8 and 10, 2000," but Castronova failed to do so, resulting in the adverse employment actions listed in count three.

In both counts three and four, the plaintiff alleged that reports of workplace violence within the department of correction involving employees other than the plaintiff are "properly investigated and acted upon" even though the allegations concerning the plaintiff were not. Counts three and four both alleged that the plaintiff has "constitutionally protected significant property interests in her reputation, employment and promotions that would affect her benefits and pension." Count three alleged that Carini's "failure, refusal and neglect to investigate and act upon the reported assault was an abuse of his authority, and constituted a deliberate indifference to the plaintiff's rights to equal protection and due process guaranteed to her by the [fourteenth] [a]mendment to the United States [c]onstitution and protected by 42

U.S.C. § 1983." Count four alleged that Castronova's "failure to investigate constituted a deliberate indifference and/or denial of the plaintiff's rights to the equal protection and due process of law guaranteed to her by the [fourteenth] [a]mendment to the United States [c]onstitution and protected by 42 U.S.C. § 1983."

In sum, the plaintiff essentially alleged that an investigation into Bubar's accusations against her would have cleared her name and that Carini's and Castronova's failure to conduct such an investigation, as required by the executive order and as is normally conducted regarding other similarly situated employees, resulted in damage to her reputation, which, in turn, resulted in adverse employment actions being taken against her. The plaintiff alleged that the failures to conduct investigations constituted violations of her equal protection and due process rights. To determine whether Carini and Castronova are entitled to qualified immunity, we must determine whether the facts alleged do in fact state clear and cognizable violations of the rights to due process and to equal protection.

We turn first to the question of whether the facts presented make out a due process violation. "The procedural component of the [d]ue [p]rocess [c]lause does not protect everything that might be described as a benefit: To have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. . . . Such entitlements are, of course, . . . not created by the [c]onstitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." (Citation omitted; internal quotation marks omitted.) *Town of Castle Rock* v. *Gonzales*, 545 U.S. 748, 756, 125 S. Ct. 2796, 162 L. Ed. 2d 658 (2005). The

issue, therefore, is whether the plaintiff had a constitutionally cognizable property interest in an investigation being conducted into the allegations against her.

In *Town of Castle Rock*, the United States Supreme Court considered the issue of whether an individual who has obtained a restraining order has a constitutionally protected interest in its enforcement by police. In its analysis of the issue, the court concluded that the relevant language of the state statute that set forth the duties of the police with regard to restraining orders did not make the enforcement of the orders mandatory. Id., 759–60. The court further stated that "[e]ven if the statute could be said to have made enforcement of restraining orders 'mandatory' . . . that would not necessarily mean that state law gave . . . an entitlement to enforcement of the mandate." Id., 764–65. This is because "[m]aking the actions of government employees obligatory can serve various legitimate ends other than the conferral of a benefit on a specific class of people." Id., 765. The state statute at issue in *Town of Castle Rock* did not mention an entitlement to enforcement to the protected persons. Id. The court also stated that "it is by no means clear that an individual entitlement to enforcement of a restraining order," were one to exist, "could constitute a 'property' interest for purposes of the [d]ue [p]rocess [c]lause" because "[s]uch a right would not . . . resemble any traditional conception of property." Id., 766. On the basis of these conclusions, the court held that "the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the [d]ue [p]rocess [c]lause, neither in its procedural nor in its 'substantive' manifestations." Id., 768.

The Supreme Court's decision in *Town of Castle Rock* guides our analysis. Even if we were to assume, arguendo, that the executive order made the investigation of complaints of workplace violence by supervisors

such as Carini and Castronova mandatory, we are not to conclude that the executive order granted to an accused employee, for the purpose of constitutional analysis, an entitlement to an investigation, or that such an entitlement, were it to exist, constituted a "property" interest for purposes of the due process clause. See id., 764–66. The executive order does not mention any entitlement to an individual, such as the plaintiff, who is accused of an act of workplace violence, to an investigation to clear her name. It prohibits acts of workplace violence, directs individuals who believe they have been victims of workplace violence or a threat of violence to report them and directs supervisors to initiate investigations of the complaints. It does not directly speak of individuals who are accused of acts of workplace violence, let alone grant them an entitlement to an investigation to clear their name. We certainly cannot draw something as significant as a constitutional right from such circumstances.

Moreover, we do not find a property interest in an entitlement to an investigation, were such an entitlement to exist, because an entitlement to process cannot constitute a property interest within the meaning of the due process clause. In *Town of Castle Rock* v. *Gonzales*, supra, 545 U.S. 748, the dissent argued that the state statute governing police officers' responsibilities with regard to restraining orders made mandatory the obligation either to make an arrest or to seek an arrest warrant. Id., 785 (Stevens, J., dissenting). The majority responded to this argument by stating that "the seeking of an arrest warrant would be an entitlement to nothing but procedure—which we have held inadequate even to support standing . . . much less can it be the basis for a property interest." (Citation omitted.) Id., 764. In his concurrence, Justice Souter expanded upon this point. He stated: "The [d]ue [p]rocess [c]lause extends

procedural protection to guard against unfair depriva-
tion by state officials of substantive state-law property
rights or entitlements; the federal process protects the
property created by state law. But [the respondent]
claims a property interest in a state-mandated process
in and of itself. This argument is at odds with the rule
that [p]rocess is not an end in itself. Its constitutional
purpose is to protect a substantive interest to which
the individual has a legitimate claim of entitlement.
. . . In putting to rest the notion that the scope of an
otherwise discernible property interest could be limited
by related state-law procedures, this [c]ourt observed
that [t]he categories of substance and procedure are
distinct. . . . Property cannot be defined by the proce-
dures provided for its deprivation. . . . Just as a [s]tate
cannot diminish a property right, once conferred, by
attaching less than generous procedure to its depriva-
tion . . . neither does a [s]tate create a property right
merely by ordaining beneficial procedure unconnected
to some articulable substantive guarantee." (Citations
omitted; internal quotation marks omitted.) Id., 771
(Souter, J., concurring).

In the present case, the plaintiff's claim that Carini's
and Castronova's failure to conduct an investigation
constituted a deprivation of her due process rights is
necessarily premised on her having a property right to
an investigation into the allegations made against her.
To assert a right to an investigation is to assert a right
to process, as in *Town of Castle Rock*. See id., 764.
The plaintiff does not have a property right to such an
investigation, according to the *Town of Castle Rock*
majority, because an investigation is process. We con-
clude that the facts alleged do not state a due pro-
cess violation.

We turn next to the issue of whether the facts alleged
state an equal protection violation. Counts three and
four allege equal protection violations by Carini and
Castronova for their failure to conduct an investigation

into the allegations of workplace violence against the plaintiff when allegations against other similarly situated employees were investigated. The plaintiff does not assert that her different treatment was caused by her membership in a particular class. As such, the plaintiff's equal protection claim may be considered a "class-of-one" claim. See *Engquist* v. *Oregon Dept. of Agriculture,* 553 U.S. 591, 594, 128 S. Ct. 2146, 170 L. Ed. 2d 975 (2008) (describing "class-of-one" theory of equal protection as claim by public employee alleging arbitrarily different treatment from other similarly situated employees with no assertion that different treatment was based on employee's membership in particular class).

In *Engquist,* the United States Supreme Court similarly considered a "class-of-one" claim. Id. The petitioner in that case was a public employee who claimed that "she was fired not because she was a member of an identified class (unlike her race, sex, and national origin claims), but simply for 'arbitrary, vindictive, and malicious reasons.' " Id., 595. She argued that the equal protection clause "forbids public employers from irrationally treating one employee differently from others similarly situated, regardless of whether the different treatment is based on the employee's membership in a particular class." Id., 597. The court rejected this argument and held that the class-of-one theory of equal protection does not apply in the public employment context. It concluded that "ratifying a class-of-one theory of equal protection in the context of public employment would impermissibly constitutionalize the employee grievance. . . . The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. . . . Public employees typically have a variety of protections from just the sort of personnel actions about which [the petitioner] complains, but the [e]qual [p]rotection [c]lause is not one of them. (Citations omitted; internal quotation marks omitted.) Id., 609.

Like the petitioner's claim discussed by the court in *Engquist*, the plaintiff's equal protection claim in the present case is premised on the class-of-one theory because it is based not on membership in a particular class but, rather, on her allegedly receiving arbitrarily different treatment from similarly situated individuals. In light of the Supreme Court's decision in *Engquist*, we conclude that the facts alleged do not state an equal protection violation.

Because there is no genuine issue of material fact as to whether a constitutionally protected property interest or a constitutionally cognizable equal protection right has been clearly violated, we conclude that Carini and Castronova are entitled to qualified immunity. We note that the absence of relief in the form of damages pursuant to 42 U.S.C. § 1983 does not mean that a person in the plaintiff's position is without remedy. The United States Supreme Court has repeatedly held that constitutional remedies are simply not substitutes for traditional state court remedies. See, e.g., *Engquist* v. *Oregon Dept. of Agriculture*, supra, 553 U.S. 591; *Connick* v. *Myers*, 461 U.S. 138, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983); *Bishop* v. *Wood*, 426 U.S. 341, 96 S. Ct. 2074, 48 L. Ed. 2d 684 (1976).

The judgment is reversed and the case is remanded with direction to grant the defendants' motion for summary judgment as to all counts of the plaintiff's amended complaint.

In this opinion the other judges concurred.